BANCO NACIONAL de CUBA, Plaintiff,

v.

F. Shelton FARR, William F. Prescott, Emmet Whitlock, Lawrence H. Dixon, H. Bartow Farr, Elizabeth C. Prescott, Fabio Freyre and Helen G. Downs, co-partners doing business as Farr, Whitlock & Co., Defendants and Third-Party Plaintiffs,

v.

COMPANIA AZUCARERA VERTIEN-TES-CAMAGUEY de CUBA and Lehman Brothers, Third-Party Defendants.

United States District Court

S. D. New York.

July 30, 1965.

Rabinowitz & Boudin, New York City, for plaintiff, Victor Rabinowitz, New York City, of counsel.

Baker, Nelson, Williams & Mitchell, New York City, for defendants and third-party plaintiffs, C. Dickerman Williams, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for third-party defendants, Whitney North Seymour, Sr., Eastman Birkett, John A. Guzzetta, Gerald M. Levin, Joel S. Hoffman, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for United States, amicus curiae, J. William Doolittle, First Asst., Civil Division, Dept. of Justice, Eugene R. Anderson, Asst. U. S. Atty., Southern Dist. of New York, Bruno A. Ristau, Carl F. Goodman, Attys., Dept. of Justice, Washington, D. C., of counsel.

Brush & Bloch, New York City, for Cuban cigar manufacturers, amici curiae, Monroe Percy Bloch, Jac M. Wolff, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for The Chase Manhattan Bank, amicus curiae, A. Donald MacKinnon, Roy C. Haberkern, Jr., Andrew J. Connick, New York City, of counsel.

John G. Laylin, Washington, D. C., for North American Sugar Industries, Inc., Cuban American Sugar Mills Co., and Cuban-American Mercantile Corp., amici curiae, William H. Allen, William A. Dobrovir, Covington & Burling, Washington, D. C., of counsel.

Katz & Sommerich, New York City, for Cultural, S.A. and Robert I. Williams, amici curiae, Otto C. Sommerich, Benjamin Busch, New York City, of counsel.

Shearman & Sterling, New York City, for First National City Bank, amicus curiae, Henry Harfield, William Harvey Reeves, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge:

This case is before me on remand from the Supreme Court of the United States (Banco Nacional de Cuba v. Sabbatino et al., 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed. 2d 804 (1964)), which reversed summary judgment in favor of defendants granted by the District Court (193 F.Supp. 375 (1961)) and affirmed by the Court of Appeals (2 Cir., 307 F.2d 845 (1962)). The facts are fully stated in the opinions of the Supreme Court, 376 U.S. at 401–408, 84 S.Ct. 923, and of the courts below. It is unnecessary to repeat them in detail here except to the extent necessary to an understanding of the issues now presented.

The case involves the proceeds of the sale of a cargo of sugar which was expropriated by the Castro government while in Cuban territorial waters from Compania Azucarera Vertientes-Camaguey de Cuba (C.A.V.), a corporation organized under Cuban law whose capital stock was owned principally by United States citizens.

The sugar was sold to Farr, Whitlock & Co. (Farr), New York sugar brokers, and the proceeds of the sale came to the United States.

The claim of plaintiff Banco Nacional de Cuba (Banco), an instrumentality of

the Cuban government, to the proceeds of the expropriated sugar is founded on the Cuban expropriation. Defendant Farr and defendant Sabbatino,[1] a State Court Receiver for C.A.V. who held the proceeds, took the position that the Cuban government was not entitled thereto but that the proceeds were the property of C.A.V. from whom the sugar was expropriated.

Judgment for the defendants below was granted on the ground that the expropriation of the sugar violated international law, was therefore invalid and unenforceable in our courts, and was ineffective to deprive C.A.V. of its rights in the sugar and its proceeds.

The Supreme Court held that the "act of state doctrine" proscribed a challenge to the validity of the Cuban expropriation law in this case even if it violated international law. It reversed and remanded the case to the District Court for further proceedings.

On October 7, 1964, subsequent to the decision of the Supreme Court and before judgment was entered on remand, the President signed the Foreign Assistance Act of 1964 containing an amendment sponsored by Senators Hickenlooper and Sparkman, which precipitated the present phase of this litigation. (Section 301(d) (4) of Public Law 88–633, 78 Stat. 1009, 1013, hereafter referred to as the Hickenlooper Amendment.) The Amendment provided:

> "Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: *Provided,* That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court, or (3) in any case in which the proceedings are commenced after January 1, 1966."

When the Amendment became law proceedings with respect to the entry of judgment on remand were still pending.

Plaintiff had moved for entry and execution of judgment in its favor. Complications not relevant here arose from the Cuban Assets Control Regulations effective July 8, 1963 (31 C.F.R. §§ 515.101–.808), which, it was claimed, required that entry of judgment and execution must be licensed by the Treasury Department. There were further complications arising from the fact that the funds which were the subject of the action had been placed in the hands of Lehman Bros. pending the outcome of this litigation under an escrow agreement executed by Sabbatino, the C.A.V. receiver, Farr, C.A.V. and the plaintiff.

---

1. Subsequent to the decision of the Court of Appeals and before the decision of the Supreme Court, Sabbatino was discharged as receiver of C.A.V. and the funds in dispute were placed in escrow pending the outcome of this suit. After remand, pursuant to stipulation of the parties, the action was discontinued as against Sabbatino and the title was amended to name as defendants only the co-partners doing business as Farr, Whitlock & Co.

Efforts to resolve these complications to the satisfaction of the various parties in interest were unsuccessful.

Plaintiff then made a superseding motion for entry and execution of judgment challenging the application and validity of the Cuban Assets Control Regulations insofar as they are claimed to relate to this case. Before that motion came on for hearing defendant Farr moved for leave to serve a third party complaint against C.A.V. and Lehman Bros. alleging their liability to Farr under the escrow agreement for the plaintiff's claim against Farr. At this stage of the proceedings the Hickenlooper Amendment became law. Farr's motion to bring in C.A.V. and Lehman as third party defendants was then granted and the third party defendants served answers to the third party complaint.

Farr then moved pursuant to Rule 56, F.R.Civ.P., for summary judgment dismissing the complaint on the basis of the Hickenlooper Amendment. The third party defendants made similar motions to dismiss the complaint and the third party complaint pursuant to Rules 14 and 56.

The defendants and third party defendants contend (1) that the Hickenlooper Amendment removed the bar interposed by the act of state doctrine to a determination of the validity of the Cuban expropriation under international law; (2) that under the Amendment this court is now required to adjudicate that issue; and (3) that in making such an adjudication this court is bound by the determination of the Court of Appeals in this case and defendants were therefore entitled to judgment dismissing the complaint.

Plaintiff, on the other hand, maintains (1) that the Hickenlooper Amendment is not applicable to this case, and (2) that if it is it is unconstitutional in its application to this case.

Some thirty-five cases involving a wide spectrum of questions arising out of Cuban expropriations are before me which had been delayed pending the final determination of the case at bar. These cases were likely to be affected if not determined by the decision on the present motions. Opportunity was therefore given to all counsel in these cases to participate in the argument of the motions and submit briefs. A number did so.

The United States, through the Department of Justice, also appeared as amicus curiae at the suggestion of the court. The United States took the position that the Amendment did not apply to any pending cases but that if it did it was valid and constitutional.

The questions posed here then are:

1. Does the Hickenlooper Amendment apply to pending cases generally?

2. Does it apply to the case at Bar?

3. Is it unconstitutional in any respect?

4. What is the effect of the Amendment on this case?

*The legislative background of the Amendment.*

In the spring of 1964 Congress had under consideration various amendments to the Foreign Assistance Act to be embodied in the Foreign Assistance Act of 1964. The section of the Act into which the Hickenlooper Amendment was later inserted already contained a number of prohibitions against aid to Communist countries and provided specifically that no assistance was to be given to Cuba, authorized the President to place an embargo on all trade with Cuba and suspended aid to countries which had expropriated property of the United States citizens without adequate compensation. 22 U.S.C. § 2370. The latter provision was the result of an amendment enacted under the sponsorship of Senator Hickenlooper in 1962.

In the summer of 1964 in the closing days of the second session of the 88th Congress while the Foreign Assistance Act of 1964 (H.R. 11380), which had already been passed by the House, was before the Senate Committee on Foreign Relations, Senator Hickenlooper, with Senator Sparkman's co-sponsorship, pro-

posed an amendment specifically directed at the act of state doctrine as enunciated by the Supreme Court in Sabbatino.[2] The whole bill including the amendment was reported out of committee on July 10, 1964 (S.Rep. 1188, at 24). The Senate Report concerning this proposal explained it as follows (U.S.Code Cong. and Adm.News 1964, p. 3852):

"The amendment is intended to reverse in part the recent decision of the Supreme Court in Banco de Nacional de Cuba v. Sabbatino, D.C. N.Y., 193 F.Supp. 375. The act-of-state doctrine has been applied by U. S. courts to determine that the actions of a foreign sovereign cannot be challenged in private litigation. The Supreme Court extended this doctrine in the Sabbatino decision so as to preclude U. S. courts from inquiring into acts of foreign states, even though these acts had been denounced by the State Department as contrary to international law.

"In the Sabbatino case, the Banco Nacional de Cuba sued to recover the proceeds of a sale of Cuban sugar by an American-owned company on the ground that the sugar, which had been expropriated, belonged to the Cuban Government. The lower courts dismissed the suit, but the Supreme Court reversed these decisions and remanded the case for further proceedings on the ground that it would not inquire into the act of the Cuban State.

\*   \*   \*   \*   \*   \*

"The effect of the amendment is to achieve a reversal of presumptions. Under the Sabbatino decision, the courts would presume that any adjudication as to the lawfulness under international law of the act of a foreign state would embarrass the conduct of foreign policy unless the President says it would not. Under the amendment, the Court would presume that it may proceed with an adjudication on the merits unless the President states officially that such an adjudication in the particular case would embarrass the conduct of foreign policy."

The amended version of H.R. 11380 was passed by the Senate on September 24, 1964. In conference with the House of Representatives some changes were made in the Hickenlooper amendment as passed by the Senate. The conference report on the Amendment as so revised stated (H.Rep. 1925, at 16 [U.S.Code Cong. and Adm.News 1964, p. 3890]):

"The managers on the part of the House regretted that there had not been an opportunity for thorough study and full hearings on the subject. The committee of conference amended the Senate language to pinpoint its precise effect, making it clear that it does not apply if no violation of international law principles is found, or if the case involves a short term irrevocable letter of credit issued in good faith prior to the taking of property by a foreign state. The exception in those individual cases in which the President determines that judicial review of the foreign government's action is not in the U. S. foreign policy interest is preserved. An additional change was added to limit the application of the amendment to cases in which the proceedings are commenced before January 1, 1966. This limitation was approved with the understanding that the congressional committees concerned will make a full review and study of the matter during the next Congress and make a determination on the need for permanent legislation."

The Amendment, as approved by the conference committee, passed by Congress and signed into law as part of the Foreign Assistance Act of 1964 by the President on October 7, 1964, has already been quoted at p. 961, supra.[3]

---

**2.** Amends. 1072, 1073, introduced June 23, 1964.

**3.** It may be noted that, during the current 1st Session of the 89th Congress, in con-

## I.

### *Application to cases pending at the time of enactment.*

■ The Hickenlooper amendment by its terms applies "in a case in which a claim of title or other right is asserted by * * * a foreign state (or a party claiming through such state) based upon * * * a confiscation or other taking after January 1, 1959." It is quite plain that Congress meant the legislation to apply to confiscations occurring after January 1, 1959, the date on which Castro came to power. There can be no doubt that by its specific language the Amendment applied retroactively to past confiscations and transactions arising therefrom which had occurred between January 1, 1959 and the date of its enactment.

The Amendment does not deal with confiscations and transactions in the abstract. It deals with "cases" and the action which courts are to take upon such cases. It consistently uses the word "case" throughout its text. Nowhere does it distinguish between cases pending at the time of its enactment and cases which were commenced prior thereto. There is certainly no language which could be remotely said to exclude the case at bar.

The Amendment contains three exceptions, including that authorizing the President to determine that application of the act of state doctrine is required in a particular case by the foreign policy interests of the United States and to file a suggestion to this effect with the court. Another relates to the time by which law suits must be commenced in order for the Amendment to apply. Each of the exceptions applies "in any case." There is no doubt that when Congress intended to make exceptions it did so

and it made no exceptions as to pending cases.

■ The direction to the courts is mandatory. It is provided that "no court in the United States *shall decline* on the ground of the federal act of state doctrine to make a determination" *in a case* which it describes. These words are not prospective as has been urged. They are mandatory in their intention and effect and require the courts to give retroactive effect to the directions of the Amendment.

Thus, looking at the Amendment in terms of its language, it plainly includes cases pending at the time of its enactment based on past confiscations and transactions coming within its terms. I find no language which can remotely be said to manifest an intention on the part of Congress to exclude pending cases or to limit its effect to prospective law suits only.

It is urged that the legislative history of the Amendment dictates the conclusion that it should not be applied to pending cases.

There is at least grave doubt as to whether, in view of what seems to be the plain meaning and intendment of the language of the Amendment, resort to legislative history is either necessary or appropriate. It has been said that resort to legislative history is justified only where the legislation is on its face "inescapably ambiguous." Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (concurring opinion of Jackson, J.). The Amendment here is far from falling within that description.

But assuming that legislative history is apposite, I find nothing in it which indicates that Congress intended the Amendment to be inapplicable to pend-

sidering the Foreign Assistance Act of 1965 both the House of Representatives and the Senate have held hearings on the Hickenlooper Amendment and both Houses have issued reports covering this subject. H.Rep.No. 321, at 31–32, S.Rep.No. 170, at 19. The House version of the Act, H.R. 7750, reenacts the Hickenlooper Amendment with only minor changes not pertinent here and extends it for one year. The Senate version, S. 1837, adopts the same minor changes as the House bill but makes the Amendment permanent. The two bills have passed their respective Houses and are now before a conference committee.

ing cases. Such indications as there are are to the contrary.

Nowhere in the reports of the Senate Committee on Foreign Relations or of the Conference Committee is there any indication of an intention to differentiate between pending cases and those not yet commenced at the date of enactment.

The report of the Senate Committee speaks not in terms of the *filing* of cases but in terms of *adjudication*. It states that "under the amendment, the Court would presume that it *may proceed with an adjudication* on the merits unless the President states officially that *such an adjudication* in the particular case would embarrass the conduct of foreign policy." (Emphasis added.) It says nothing about any limitations on the power of the court to proceed with such an adjudication because the case was already pending before it.

It was the conference committee which, to "pinpoint" the precise effect of the statute, amended the Senate language so as to include additional specific exceptions "in any case" to which they applied. Its report also speaks in terms of "the case" or "individual cases" throughout without any distinction between cases brought before or after enactment.

Moreover, the addition of the January 1, 1966 cut-off date was made upon the understanding "that the congressional committees concerned will make a full review and study of the matter during the next Congress and make a determination on the need for permanent legislation." No significant experience would be available on which to evaluate the effect of the Amendment if it were limited to cases commenced after October 7, 1964 (the date of enactment) on any realistic view of the normal time periods involved in the judicial process.

The secondary legislative history in the congressional record, for whatever it may be worth, see United States v. International Union United Auto., etc., Workers, 352 U.S. 567, 585–586, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957), Schwegmann Bros.

v. Calvert Distillers Corp., supra, throws little enough light on the problem. But what light it does throw tends to support the view that no distinction between cases pending at the time of enactment and cases subsequently commenced was intended.

As Senator Hickenlooper said "Basically the amendment is designed to assure that the private litigant is granted his day in court." 110 Cong.Rec. 18936 (daily ed. Aug. 14, 1964). Both Senator Hickenlooper in the Senate and Congressman Adair in the House, in explaining the Amendment in its final form spoke of freeing the courts in "cases before them" to enforce international law. 110 Cong. Rec. 22848–49 (daily ed. Oct. 2, 1964); 110 Cong.Rec.—App. A5157 (daily ed. Oct. 7, 1964).

In introducing the Amendment Senator Hickenlooper, as co-sponsor, explained the January 1, 1959 operative date in these words

"January 1, 1959, is the date of the coming to power of the Castro regime in Cuba and the beginning of the greatest series of illegal takings of American property in recent history. Some cut-off date is desirable and it is clear that prior to the Supreme Court's reversal of the lower courts in the Sabbatino case *parties* were not relying on any such drastic application of the act of state doctrine."

110 Cong.Rec. 18946 (daily ed. Aug. 14, 1964) (emphasis added). Plainly, Senator Hickenlooper, a lawyer, used the word "parties" as meaning parties to law suits.

These are little more than straws in the wind. But as such they indicate congressional understanding that all cases pending or otherwise arising out of confiscations occurring after January 1, 1959 were meant to be included and certainly not that the Amendment was to be limited only to cases filed after its enactment.

Such a construction of the Amendment is entirely consistent with and in furtherance of its purposes.

The Amendment was not a haphazard rider extraneous to the purposes of the bill to which it was added. It is part of a consistent pattern of legislation, the purpose of which was to protect private investment abroad and to discourage foreign expropriations. As carried over from previous years the Foreign Assistance Act already included provisions for the cut-off of foreign aid to countries which had expropriated property of American nationals. It also provided for cutting off all aid to Cuba and authorized an embargo on trade with that country. These provisions had been strengthened from year to year. 22 U.S. C.A. § 2370 (Historical Note).

Congress was particularly concerned with the Cuban confiscations which had taken place on such a large scale. It was for this reason, as Senator Hickenlooper made clear, that the date of January 1, 1959 was used as the operative date. A prime concern was to prevent the Castro government from reaping the fruits of what Congress considered to be illegal and unconscionable acts in violation of international law. It can scarcely be assumed that Congress intended to exclude a substantial portion of the Cuban confiscations at which the statute was directed from the benefits of the statute in the absence of specific language to that effect.

It is true that the Amendment also had a broader purpose—to discourage illegal confiscations by foreign governments in violation of international law and thus to strengthen the flow of investment in commerce and protect American investments abroad under the aid program and otherwise. One of the ways in which it sought to do this was to insure that the United States did not become a "thieves' market."

It is urged that the Amendment should be construed so as to apply only to cases filed after its enactment because to do otherwise would not further these broad congressional purposes. It is difficult to see, however, how such purposes would be furthered by a construction which excluded from the deterrent effect of the Amendment a substantial number of confiscations which had already occurred and on which suits were presently pending. On the contrary, bold and immediate action with respect to all confiscations, including those already in litigation, would serve firm notice that as far as the United States was concerned no benefits would be permitted to accrue from such takings.

Congress was concerned not only with the assertion of claims to expropriated property but with permitting one who had suffered expropriation to resist a suit in our courts by the expropriating government to obtain the fruits of expropriation. (110 Cong.Rec.—App. A5157 (daily ed. Oct. 7, 1964) (remarks of Sen. Hickenlooper)). This is what had occurred in this case and in other pending cases where an instrumentality of the Cuban government was seeking to enforce its expropriation against assets in this country over which it otherwise could assert no control. To exclude such cases from the Amendment would frustrate congressional purpose.

Both the language of the Amendment and the legislative history lead to but one conclusion—that it was intended to apply to cases pending at the time it became law.[4]

---

4. There is nothing in the Cuban Claims Act, 22 U.S.C. §§ 1643–1643k, which was before the Congress at approximately the same time as the Hickenlooper Amendment, or in its legislative history that in any way casts doubt upon this construction. The Cuban Claims Act was a separate bill dealing with a separate problem— the preservation of evidence of claims against the Cuban government in case diplomatic negotiations should give promise of ripening. Indeed, the vesting provision of that Act, 22 U.S.C. § 1643j, excluded property acquired by expropriation, apparently so as not to deprive persons in the position of defendants of their rights under the Hickenlooper Amendment. See 110 Cong.Rec. 22852 (daily ed. Oct. 2, 1964) (statement of Rep. Fascell, sponsor of the bill).

It is urged, however, that this reading is contrary to traditional canons of statutory construction.

There is much discussion in this connection as to whether the Hickenlooper Amendment is substantive, see, e. g., Rescue Army v. Municipal Court, 331 U.S. 549, 570, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947), procedural, see, e. g., Bowles v. Strickland, 151 F.2d 419 (5 Cir. 1945), remedial (in the sense of affecting the availability of remedies), see, e. g., Sampeyreac v. United States, 32 U.S. (7 Pet.) 222, 8 L.Ed. 665 (1833); Landay v. United States, 108 F.2d 698 (6 Cir. 1939), cert. den., 309 U.S. 681, 60 S.Ct. 721, 84 L.Ed. 1024 (1940), remedial-substantive (in the sense of remedying an existing decisional or statutory defect in substantive law), see, e. g., Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082 (1930); Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265 (1924), remedial-procedural (in a similar sense with respect to procedural law), see, e. g., Goddard v. Frazier, 156 F.2d 938 (10 Cir.), cert. den., 329 U.S. 765, 67 S.Ct. 124, 91 L.Ed. 659 (1946). Once the proper category is selected, it is said, a traditional canon of statutory construction will tell us whether or not the Hickenlooper Amendment is to be applied to pending cases. But such a dispute over categories sheds little light on the controversy here.

■ In the first place, what is substantive and what is procedural or remedial varies with the purpose for which the terms are used. See, e. g., Sampson v. Channell, 110 F.2d 754, 128 A.L.R. 394 (1 Cir.), cert. den., 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415 (1940). Moreover, there is always danger that the particular purpose of the terms will be lost in a mere semantic exercise. But while such categorization may have value as a matter of last resort, it is not only necessary here but actually inapposite.

■ Canons of statutory construction should be applied only when the intention of the legislature is unclear. If a statute "clearly, by express language or necessary implication, indicates that the legislature intended a retroactive application," the statute must be so applied regardless of the label that may be attached to it unless such a construction would render it unconstitutional. 2 Sutherland, Statutory Construction §§ 2201, 2212 (3d ed. Horack 1943). The wording of the statute and its legislative history clearly show that it was intended to apply to pending cases.

■ Moreover, the canons are designed to aid in determining whether a statute is applicable to past transactions. But here the statute is clear on its face that it applies to all confiscations after January 1, 1959 and transactions arising therefrom. The question is whether an exception is to be made for such transactions already in litigation when the Amendment was passed.[5] Thus such cases as Claridge Apartments Co. v. Commissioner of Internal Revenue, 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944), Hasset v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858 (1938), Davis v. Wechsler, 263 U.S. 22, 44 S.Ct. 13, 68 L.Ed. 143 (1923), Cox v. Hart, 260 U.S. 427, 43 S.Ct. 154, 67 L.Ed. 332 (1922), and Winfree v. Northern Pac. Ry. Co., 227 U.S. 296, 33 S.Ct. 273, 57 L.Ed. 518 (1913), are inapplicable. Indeed, in the Claridge case the statute in question was applied to reorganization proceedings pending at the time of passage but not those already closed. And the result in that case is fully in accord with the general rule of construction governing

---

5. The Government suggests that the Amendment could be construed to apply only to transactions after its passage involving property confiscated any time after January 1, 1959. If the basic principle in the law merchant of shelter, see Uniform Commercial Code §§ 2–403(1), 3–201 & comment 3, is not to be abandoned, virtually the only past seizures to which the Amendment would apply would be those in which the confiscating government disposed of the property after October 7, 1964. The Cuban confiscations would be read out of the Amendment almost entirely and there would be little if any opportunity for it to operate before January 1, 1966.

this amendment: that when a statute is to be retroactively applied to past transactions, it is applied to those involved in pending litigation as well. This rule originated in Chief Justice Marshall's opinion in United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 109, 2 L.Ed. 49 (1801),[6] and has been followed ever since. E. g., Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed. 2d 300 (1964); United States v. State of Alabama, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960) (per curiam); Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Carpenter v. Wabash Ry. Co., 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940); Dinsmore v. Southern Express Co., 183 U.S. 115, 22 S.Ct. 45, 46 L.Ed. 111 (1901); cf. Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941).

## II.

### The application of the Amendment to the case at bar.

It is urged that the Amendment does not apply to this case at least, even if it applies to other pending cases and that Congress so intended. I find nothing to sustain that view.

The language of the Amendment does not support this position. There is no dispute that the Amendment was directed at the Sabbatino decision and the act of state doctrine which it enunciated but there is no specific reference to this case either in the Amendment as it was introduced or as it was passed. There is merely the mandatory direction that "no court shall decline" to make a determination on the merits under the principles of international law on the ground of the Federal Act of State Doctrine in a case based on a confiscation after January 1, 1959 and commenced before January 1, 1966. This case is plainly such a case. The statute applies to this case unless it is excluded for reasons apart from its language.

If the legislative history of the statute indicated plainly that Congress intended to exclude the Sabbatino case from the application of the statute the Amendment might well be held inapplicable for that reason. However, I do not find anything in the legislative history which demonstrates such an intention and certainly that intention would have to be clearly expressed were the language of the Amendment to be overridden.

The reports of the committees which considered this legislation do not indicate any intention to exclude this case from the statute. The report of the Senate Committee already quoted, supra, p. 963, states flatly "the amendment is intended to reverse in part the recent decision of the Supreme Court" in Sabbatino.

The report of the Committee on Conference does not mention the Sabbatino case at all or add anything which would shed light on the question now under consideration.

However, much reliance is placed on an excerpt from a memorandum inserted in the Congressional Record by Senator Hickenlooper during the discussions of the Amendment:

"2. Question: 'Does the proposed amendment overrule a decision of the Supreme Court?'

"Answer: 'The amendment will lead U. S. courts to a different result from that reached by the majority in the recent Supreme Court decision in Banco Nacional de Cuba v. Sabbatino. It does not change the Court's decision in that case, * *.' "

110 Cong.Rec. 18946 (daily ed. Aug. 14, 1956).

Material of this nature inserted in the Congressional Record must be viewed with grave reservations. As Justice Jackson said in his concurring opinion in Schwegmann Bros. v. Calvert Distill-

---

6. Chief Justice Marshall also indicated that "in great national concerns" statutes are more likely to be construed retroactively than "in mere private cases between individuals." This is such a case.

ers Corp., supra, 341 U.S. at 396, 71 S.Ct. at 751:

> "[T]o select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions."

But quite apart from this the isolated excerpt from the Hickenlooper memorandum must not be taken out of context and must be viewed against the background of the entire legislative record which is by no means brief.

The statement opposing the Amendment by the Executive Branch before the Senate Committee said unequivocally "The amendment is intended to reverse the recent decision of the Supreme Court" in Sabbatino and spoke of "the attempt in the subject amendment to overturn the Sabbatino decision * *." Hearings 618.

In presenting the Amendment to the Senate on August 14, 1964, Senator Hickenlooper stated "This amendment goes specifically to the so-called Sabbatino decision of the Supreme Court." 110 Cong. Rec. 18935 (daily ed.). In his letter to the Washington Post inserted in the Congressional Record of the same day he said:

> "It should be noted that the amendment is not intended to reinstate the broad holding established in the trial court. *It only modifies the Supreme Court decision in the matter of presumptions.* We think it perfectly proper that the Congress of the United States should have the last word on this important policy question." Id. at 18936 (emphasis added).

In a statement inserted in the Record on that day Senator Hickenlooper said that the Amendment "assures that U. S. Courts *in cases before them* will be able to apply international law to expropriations by foreign countries," except where the President makes a suggestion to the contrary. Id. at 18943 (emphasis added). That statement is repeated in the very memorandum containing the sentence upon which so much reliance is placed. Id. at 18945.

In any event what is meant by this single sentence is far from clear and it is entirely inconclusive on the question of the applicability of the Amendment to this case, in the light of the other legislative material. It certainly is far too slender a reed on which to base a holding that the Amendment does not apply to this case.

Moreover, in the light of its strongly expressed views concerning the iniquities of the Castro regime and its confiscations, it is most unlikely that Congress intended to exclude the Sabbatino case from the Amendment if this court has power to apply it. Due to no fault of the defendants Sabbatino was the bellwether case on Cuban confiscation. Some forty pending cases were delayed to await its determination by the Supreme Court. Thus, by a purely fortuitous circumstance the defendants in Sabbatino would be the only victims of the confiscations among the litigants who would be denied the benefits of a determination on the merits under the principles of international law.

Moreover, the Cuban government would receive a windfall. It would avoid a determination on the merits as to whether the taking had been in violation of international law.

Against the background of the fulsome record of congressional attitude with respect to the Castro government and its confiscations, no intention to permit such a result can be ascribed to Congress.

The real question as to the applicability of the Amendment in this court does not arise because the Amendment by its terms or by implication is not applicable. It arises because the case is before me on remand from the Supreme Court and judgment has not been entered.

The Supreme Court did not reach the ultimate merits of the claims asserted by the respective parties or the question

of the validity of the Cuban expropriation decree. It held merely that the act of state doctrine applied, that under that doctrine the courts of this country were precluded from inquiring into the validity of the public acts of a recognized foreign sovereign power in its own territory even if such acts violated international law, and that this doctrine proscribed a challenge to the validity of the Cuban expropriation decree in this case. Any judgment to be entered in favor of the plaintiff would have had to be based on that theory and on that theory alone.

While the proceedings on remand were still pending and undetermined the Hickenlooper Amendment became law. It was specifically and solely directed at the act of state doctrine on which the Supreme Court relied and it changed the law with respect to that subject.

Assuming that the Amendment was within the constitutional powers of Congress (see p. 971, infra) it was then no longer the law that a challenge to the validity of the expropriation decree was proscribed by the act of state doctrine. Instead, the law as laid down by Congress then became that no court might decline to make such a determination on the ground of the act of state doctrine where the confiscation was in violation of the principles of international law. Is this court then, in a case pending before it on remand, required to follow the mandate which Congress directed to it and the law as changed by Congress. Or is it bound under the mandate of the Supreme Court to enter a judgment consistent with the Supreme Court opinion and contrary to the law laid down by Congress—that is to say a judgment which applies the act of state doctrine so as to bar an inquiry into the validity of the expropriation decree. This is the dilemma which now faces the court.

■ The Supreme Court has long held to a general rule that the mandate of an appellate court forecloses the lower court from reconsidering the matters determined above. E. g., United States v. Haley, 371 U.S. 18, 83 S.Ct. 11, 9 L.Ed.

2d 1 (1962) (per curiam); United States v. Parke, Davis & Co., 365 U.S. 125, 81 S.Ct. 433, 5 L.Ed.2d 457 (1961) (per curiam); United States v. Urbuteit, 336 U.S. 804, 69 S.Ct. 840, 93 L.Ed. 1052 (1949) (per curiam); Briggs v. Pennsylvania R. R. Co., 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948); Kansas City So. Ry. Co. v. Guardian Trust Co., 281 U.S. 1, 50 S.Ct. 194, 74 L.Ed. 659 (1930); In re Washington & G. R. R. Co., 140 U.S. 91, 11 S.Ct. 673, 35 L.Ed. 339 (1891); Chaffin v. Taylor, 116 U.S. 567, 6 S.Ct. 518, 29 L.Ed. 727 (1886); Tyler v. Magwire, 84 U.S. (17 Wall.) 253, 21 L.Ed. 576 (1872); Ex parte Dubuque & Pac. R. R. Co., 68 U.S. (1 Wall.) 69, 17 L.Ed. 514 (1863); Ex parte Sibbald v. United States, 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838).

The mandate rule has been applied to foreclose the lower court from considering on remand its own jurisdiction, Aspen Mining & Smelting Co. v. Billings, 150 U.S. 31, 14 S.Ct. 4, 37 L.Ed. 986 (1893); Skillern's Executors v. May's Executors, 10 U.S. (6 Cranch) 267, 3 L.Ed. 220 (1810) (per curiam), newly discovered evidence, In re Potts, 166 U.S. 263, 17 S.Ct. 520, 41 L.Ed. 994 (1897); Mackall v. Richards, 116 U.S. 45, 6 S.Ct. 234, 29 L.Ed. 558 (1885); Southard v. Russell, 57 U.S. (16 How.) 547, 14 L.Ed. 1052 (1853), or a supervening Supreme Court decision that would allegedly require a different result, Gaines v. Rugg, 148 U.S. 228, 13 S.Ct. 611, 37 L.Ed. 432 (1893).

■ Of course, the general mandate rule does not apply to a question that is left open by the mandate itself. Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Ex parte Union Steamboat Co., 178 U.S. 317, 20 S.Ct. 904, 44 L.Ed. 1084 (1900); In re Sanford Ford & Tool Co., 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895). Nor does it apply when the mandate has been amended to permit consideration of the question. See Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 477, 68 S.Ct. 1186, 92 L.Ed. 1502 (1948); 149 Madison Ave. Corp. v. Asselta, 331 U.S.

795, 67 S.Ct. 1726, 91 L.Ed. 1822 (1947) (per curiam); Alaska Juneau Gold Mining Co. v. Robertson, 331 U.S. 793, 67 S.Ct. 1728, 91 L.Ed. 1821 (1947) (per curiam).

There is no need for the mandate to be amended here.[7] The mandate reversed the decision of the Court of Appeals and remanded the case to this court "for further proceedings in conformity with the opinion of this Court." The opinion specifically left open to this court the admission of C.A.V. as a party, which is to some extent responsible for the present posture of this case. It stated "Although we discern no remaining litigable issues of fact in this case, the District Court may hear and decide them if they develop." 376 U.S. at 408, 439, 84 S.Ct. at 946. Thus, the Supreme Court envisioned that there might be more than merely formal proceedings in this court before judgment could be entered.

■■ Moreover, the general mandate rule is inapplicable here for another reason. None of the cases cited involve a statute enacted after remand but before the final disposition of the case. Here Congress, in the exercise of its constitutional powers, see p. 971, infra, enacted the Amendment and gave directions that it apply to all pending cases. This constitutes the supreme law of the land. U.S.Const. art. VI, cl. 2. The mandate rule, however, sometimes referred to as the law of the case, Ex parte Sibbald v. United States, supra; Munro v. Post, 102 F.2d 686 (2 Cir. 1939), is not of constitutional dimensions. It represents "only the practice of courts generally to refuse to reopen what has been decided," King v. State of West Virginia, 216 U.S. 92, 100, 30 S.Ct. 225, 229, 54 L.Ed. 396 (1910), as that practice has been laid down by appellate courts in the exercise of their appellate powers. The Supreme Court has expressly held that it is no denial of constitutional rights for a lower state court after remand from a state appellate court to do exactly what Congress has directed this court to do. Chase Securities Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945). In the fact of a constitutional assertion of power by Congress, the courts have no choice but to accommodate their administrative practices to the congressional direction.

■ I hold (1) that this is a case within the purview of the Hickenlooper Amendment; (2) that the Amendment is supervening law which must be applied here despite the opinion of the Supreme Court in Sabbatino; and (3) that I am therefore required to make a determination on the merits giving effect to the principles of international law as the Amendment provides.

## III.

*Constitutional aspects.*

The United States takes the position that the Hickenlooper Amendment is valid and constitutional whether or not it applies to pending cases and in particular to the case at bar. Plaintiff, however, claims that the Amendment violates the Constitution both generally and insofar as it is held to apply in this case. A discussion of the constitutional questions raised is in order.

### (a)

■ The contention that Congress lacks constitutional power to enact legislation of this nature is without substance.

As to the power of Congress to enact the Amendment, Senator Hickenlooper said:

"There can be no question that the amendment is a constitutional exercise of Congress [*sic*] powers with respect to the aid program, foreign commerce, and offenses against international law."

---

7. The parties first agreed that the Hickenlooper Amendment was passed too late for the Supreme Court to amend its mandate. The third party defendants now indicate that may not be so. I will not attempt to determine the powers of the Supreme Court under its own rules, and there is no need to do so here.

110 Cong.Rec. 18946 (daily ed. Aug. 14, 1964).

The power granted to Congress by Art. I, § 8, cl. 3, of the Constitution "to regulate Commerce with foreign Nations, and among the several States" is broad and plenary. The "power * * * is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196–197, 6 L.Ed. 23 (1824). "Any rule * * * which is intended to foster, protect and conserve * * * commerce, or to prevent the flow of commerce from working harm to the people of the nation, is within the competence of Congress." Mulford v. Smith, 307 U.S. 38, 48, 59 S.Ct. 648, 652, 83 L.Ed. 1092 (1939).

It cannot be seriously disputed that the Foreign Assistance Act is a valid exercise of congressional power under the commerce clause. American investment abroad is an important part of the Foreign Assistance program. That part of the program is dependent upon whether American investors receive fair treatment from foreign governments. As the Supreme Court said in Sabbatino:

> "Foreign aid given to many of these countries provides a powerful lever in the hands of the political branches to insure fair treatment of United States nationals."

376 U.S. at 435, 84 S.Ct. at 944.

But Congress was of the view that the weapons available to the political branches to insure fair treatment of United States nationals investing abroad were inadequate. A major purpose of the Amendment was to afford additional protection to such investors against foreign confiscation. It was designed to "discourage foreign expropriation by making sure that the United States cannot become a 'thieves market' for the product of foreign expropriations." 110 Cong. Rec. 18944 (daily ed. Aug. 14, 1964).

Congress sought to encourage foreign investment by removing the bar of the act of state doctrine to determination on the merits of suits arising out of foreign confiscations in violation of international law.

Whether the act of state doctrine is applied or withheld by the courts may profoundly affect foreign investments and the flow of international trade and commerce as the Supreme Court recognized in Sabbatino. 376 U.S. at 433–436, 84 S.Ct. 923.

Congress determined that the national interests in the areas of foreign investment and international trade and commerce require the elimination of the act of state doctrine except where the President determines otherwise. It so provided in the Hickenlooper Amendment. This, like the Foreign Assistance Act itself, was plainly within the powers of Congress under the commerce clause.

Were there any doubt as to this it would be dispelled by the grant of the additional power under Art. I, § 8, cl. 18, "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

It is unnecessary to look further for sources of congressional power. It may well be that, as Congress thought, the Amendment is also a valid exercise of its power under Art. I, § 8, cl. 10 to "define and punish * * * Offences against the Law of Nations." The Amendment may also fall within the ambit of implied congressional power over foreign relations. Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); Henkin, "The Law of the Land and Foreign Relations," 107 U.Pa.L.Rev. 903, 913–22 (1959); see United States v. Arjona, 120 U.S. 479, 483, 7 S.Ct. 628, 30 L.Ed. 728 (1887); cf. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Contra Patterson, "In re the United States v. Curtiss-Wright Corp." (pts. 1–2), 22 Texas L.Rev. 286, 445 (1944).

But congressional power under the commerce clause is so clear that to dis-

cuss these less obvious questions would be merely gilding the lily.

### (b)

The suggestion is made that the Amendment impinges upon the power of the President over foreign relations and thus violates the doctrine of separation of powers. I see no merit in this suggestion.

This Amendment did not become law by the action of Congress alone. It was part of an act signed into law by the President. While the Executive Branch opposed the Amendment before the Senate committee, the President did not choose to exercise his veto power when it came before him for signature. He certainly had the power to do so had he felt that the Amendment seriously impinged upon his executive functions.

Indeed, the act cannot be said to impinge on such functions. It does not preclude the President from exercising his role in foreign relations. On the contrary, the exception written into the act expressly provides that the courts shall apply the act of state doctrine whenever the President determines that the foreign policy interests of the nation require its application and makes such a suggestion. He may do so "in any case" in which he so determines, and there is nothing in the act theoretically to prevent him from so doing in every case if he determines he should make such a determination.

"The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government * * *." Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311 (1917), (quoted with approval in Sabbatino, 376 U.S. at 423, 84 S.Ct. 923). Congress has frequently exercised power in this field.

The Foreign Assistance Acts profoundly affecting foreign relations, are classic examples. No case has been cited and I know of none in which action by Congress, within one of the express powers granted to it by Art. I, § 8, cl. 3, which affected foreign affairs, has been stricken down as in violation of the separation of powers doctrine.

In the Sabbatino case itself the Supreme Court recognized that the scope of the act of state doctrine "must be determined according to federal law" drawn from sources such as the power of Congress to regulate foreign commerce under Art. I, § 8, cl. 3, and to define and punish offenses against the law of nations under Art. I, § 8, cl. 10 of the Constitution, 376 U.S. at 427 & n. 25, 84 S.Ct. 923, and refers to the power of the "political branches" to protect American investors, e. g., 376 U.S. at 436, 84 S.Ct. 923.

In La Abra Silver Mining Co. v. United States, 175 U.S. 423, 20 S.Ct. 168, 44 L.Ed. 223 (1899), the exercise of congressional power touching intimately upon foreign affairs was upheld. There Congress had conferred on the Court of Claims jurisdiction to determine whether the settlement of a claim under a treaty by an international claims commission had been fraudulently obtained. The court said in language that is highly apposite here: "[T]he act is not liable to the objection that it subjected to judicial determination a matter committed by the Constitution to the exclusive control of the President. The subject was one in which Congress had an interest, and in respect to which it could give directions by means of a legislative enactment." 175 U.S. at 459, 20 S.Ct. at 180.

Numerous other cases have upheld the exercise of congressional power affecting foreign relations. Thus a treaty negotiated by the President and approved by the Senate may be abrogated by act of Congress. Reid v. Covert, 354 U.S. 1, 18 & n. 34, 77 S.Ct. 1222, 1 L.Ed. 2d 1148 (1957) (opinion of Black, J.); Fong Yue Ting v. United States, 149 U.S. 698, 720–721, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); Chinese Exclusion Case, 130 U.S. 581, 600–601, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); Whitney v. Robertson, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888); Head Money Cases, 112 U.S. 580, 598–599, 5 S.Ct. 247, 28 L.Ed. 798 (1884).

Moreover, Congress has frequently enacted legislation in the exercise of one of its enumerated powers which was deeply concerned with foreign relations. For example, all of Title 22 of the United States Code entitled "Foreign Relations and Intercourse" deals with statutes passed by Congress on this subject matter. Of particular note are §§ 2181–2184 dealing with governmental guarantee of foreign investments by United States citizens.

Nothing in Chicago & So. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948) or United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936) on which plaintiff relies, is to the contrary. In both cases the presidential action involved had been authorized by act of Congress and the President had based his action on the statute. In the Chicago & So. case, for example, the statute involved, 49 U.S.C. § 1461, expressly provided that certificates of convenience and necessity for foreign air transportation should be subject to the approval of the President.

Thus, Congress is not restricted from exercising its enumerated powers because foreign relations are affected. The Amendment does not violate the separation of powers doctrine because it involves foreign relations and imposes a duty on the President to make specific determinations as to whether "in any case" application of the act of state doctrine is required by our foreign policy interests. It does not impinge on the constitutional prerogatives of the President in the field of foreign relations and is not unconstitutional for that reason.

### (c)

Application of the act of state doctrine is not required by the Constitution as the Supreme Court made plain in Sabbatino.

"* * * it cannot of course be thought that 'every case or controversy which touches foreign relations lies beyond judicial cognizance.' Baker v. Carr, 369 U.S. 186, 211, [82 S.Ct. 691, 707, 7 L.Ed.2d 663]. The text of the Constitution does not require the act of state doctrine; it does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of state." 376 U.S. at 423, 84 S.Ct. at 938.

It is true that the doctrine does have "constitutional underpinnings." 376 U.S. at 423, 84 S.Ct. 923. But this is not because the doctrine itself is of constitutional dimensions. Under the act of state doctrine the courts abstain from passing on the acts of a foreign state not because they are required to do by the Constitution but because of a sensitive regard for the functions entrusted by the Constitution to the political branches of the government in the field of foreign affairs and the foreign policy interests of the nation which may be affected by a determination on the merits of the case before the courts. The doctrine is merely a principle of decision " * * * compelled by neither international law nor the Constitution * * *." 376 U.S. at 427, 84 S.Ct. at 940.

### (d)

While the act of state doctrine is not of constitutional dimensions, and there is no constitutional requirement that it be applied by the courts, this does not resolve the question of whether there is a constitutional impediment to a legislative direction that the courts abstain from applying it. Plaintiff urges that there is such an impediment, and that the legislative direction to the courts in the Amendment not to apply the doctrine is an unconstitutional interference with the judicial power. I do not agree.

There is no doubt that issues concerning international law as they may affect confiscations by foreign governments are within the constitutional jurisdiction and judicial competence of the courts, as Sabbatino makes clear. By applying the act of state doctrine the courts have merely declined as a matter of judicial policy to decide such issues

where a decision may affect our foreign relations. The doctrine is a self-imposed discretionary rule of "judicial abnegation," 307 F.2d at 857, under which the court as a matter of policy declines to decide the issue of the validity of a foreign act of state.

The reasons why the courts determined on such a policy are significant. As Sabbatino also indicates, the conduct of foreign relations is particularly a concern of the political branches of the Government. It was because of apprehension that decisions on the merits concerning acts of confiscation by foreign governments might embarrass the political branches in conducting foreign relations and adversely affect the national interests in that area that the court adopted the policy of abstention.

When a determination is made by the political branches charged with the responsibility for foreign relations as to where the interests of the United States lie, it is not for the courts to say them nay. The basic reason for the application of the act of state doctrine disappears. To require that the doctrine be applied despite the express directions of the political branches on the subject would be to place the court in the position of having the last word in matters affecting foreign affairs, the determination of which is committed to other branches of the Government. This would be wholly inconsistent with the doctrine of separation of powers and with the very rationale of the act of state doctrine.

■ In any event Congress does not lack power to direct that the act of state doctrine be eliminated as an instrument of judicial decision.

Congress has been given a considerable measure of power with respect to the courts. See Art. I, § 8, cl. 9, (power "to constitute Tribunals inferior to the Supreme Court"); Art. III, § 1, (judicial power vested in Supreme Court "and in such inferior Courts as the Congress may from time to time ordain and establish"); Art. III, § 2, cl. 2, (appellate jurisdiction in the Supreme Court "with such Exceptions, and under such Regulations as the Congress shall make"); and Art. I, § 8, cl. 18 (power to make all laws necessary and proper "for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States * * *.").

There are a number of cases upholding acts of Congress under these powers limiting the appellate jurisdiction of the Supreme Court or the jurisdiction of the lower federal courts. E. g., Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943); Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938); Ex parte McCardle, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868); Sheldon v. Sill, 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850).

Moreover, in a number of instances the courts have abandoned a formerly declared voluntary policy of abstention, basing their change of position in whole or in part upon an act of Congress directing that issues on which the courts had abstained should be decided. Compare Tennessee Electric Power Co. v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), and Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), with Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), and FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Willing v. Chicago Auditorium Ass'n, 277 U.S. 274, 48 S.Ct. 507, 72 L.Ed. 880 (1928), with Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937); Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940), and Byers v. McAuley, 149 U.S. 608, 13 S.Ct. 906, 37 L.Ed. 867 (1893), with Markham v. Allen, 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946); City of Atlanta v. Ickes, 308 U.S. 517, 60 S.Ct. 170, 84 L.Ed. 440 (1939) (per curiam), with Associated Indus. v. Ickes, 134 F.2d 694 (2 Cir.), vacated per curiam as moot, 320

U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943). See also the discussion of Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924), in Alabama Power, 302 U.S. at 483–484, 58 S.Ct. 300.

In Markham v. Allen, supra, it was held that jurisdiction was conferred on the district court by the Trading with the Enemy Act over a suit by the Alien Property Custodian against an executor and heirs to determine his right to share in a decedent's estate then under probate administration in a state court. This was despite a previously announced judicial policy of abstention as to unsettled questions of state property law, see e. g., Thompson v. Magnolia Petroleum Co., supra, particularly in matters within state probate jurisdiction, see e. g., Byers v. McAuley, supra. In Markham the court permitted the suit because of provisions of the Trading with the Enemy Act indicating "that Congress has adopted the policy of permitting the custodian to proceed in the district courts to enforce his rights under the Act, whether they depend on state or federal law." 326 U.S. at 496, 66 S.Ct. at 299.

In Aetna Life Ins. Co. v. Haworth, supra, it was held that the Declaratory Judgments Act, now 28 U.S.C. §§ 2001–2002, was valid and should be given application though Willing v. Chicago Auditorium Ass'n, supra, had previously indicated that the court would not entertain actions which were declaratory only. The court said in Aetna:

"In providing remedies and defining procedure in relation to cases and controversies in the constitutional sense the Congress is acting within its delegated power over the jurisdiction of the federal courts which the Congress is authorized to establish * * *." 300 U.S. at 240, 57 S.Ct. at 463 (citations omitted).

And in Yakus v. United States, supra, it was said:

"The legislative formulation of what would otherwise be a rule of judicial discretion is not a denial of due process or a usurpation of judicial functions." 321 U.S. at 442, 64 S.Ct. at 675.

■ It seems clear that when Congress, dealing with subject matter within the powers delegated to it by the Constitution, speaks with respect to a voluntary judicial policy of self-limitation, the courts are bound to follow its directions unless compelled not to do so by the Constitution. There is no constitutional compulsion to disregard the directions of Congress as to the elimination of the self-imposed limitation of the act of state doctrine as provided in the Amendment.

As Chief Justice Marshall said in Cohens v. Commonwealth of Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821):

"It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us."

(e)

■ The provision in the Amendment giving the President the power to invoke the act of state doctrine in cases where national foreign policy interests so require does not oust the court of jurisdiction. Nor is it an unwarranted or unconstitutional interference with the judicial function.

■ It is not unusual for Congress to enact statutes giving to the Executive Branch the power to determine finally, litigable questions in the foreign affairs field. E. g., 12 U.S.C. § 632; 22 U.S.C. §§ 254, 288e–288f; see Carrera v. Carrera, 84 U.S.App.D.C. 333, 174 F.2d 496 (1949). And it is quite clear that the Executive may tell the courts when it is in the national interest to grant sover-

eign immunity to a foreign state, and that suggestion by the Executive is conclusive. Ex parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); Rich v. Naviera Vacuba, S. A., 295 F.2d 24 (4 Cir. 1961) (per curiam). The primacy that the Constitution delegates to the political branches in the field of foreign affairs dictates such a result.

This is not like the situation in Chicago & So. Air Lines, Inc. v. Waterman S.S. Corp., supra, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568, and other cases in which the principle of judicial independence, established in Hayburn's Case, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792), was held to have been violated.

Under the Amendment, as in the sovereign immunity situation, the President is not sitting as a court of review over decisions of the judiciary. He does not attempt to decide the merits of the controversy between the parties. He is merely given the power to determine whether the courts should abstain from deciding one aspect of the merits. The effect of what he does may not be determinative of the final outcome of the litigation. But its effect upon the foreign policy interests of the United States may well be vital.

■■ The purpose of the Hickenlooper Amendment is to establish a presumption that an adjudication on the merits will not embarrass the Executive Branch in the conduct of our foreign policy. S.Rep. No. 1188, supra, at 24; 110 Cong.Rec. 18936–37 (daily ed. Aug. 14, 1964). But when a presumption, designed by the courts to meet the requirements of another branch in the exercise of its plenary constitutional powers, is determined by that branch not to meet such requirements, and the courts are so advised, the courts will not give effect to the presumption. This is so even if decisions have already been made by the courts on the basis of the presumption. In such case the courts will revise their decisions accordingly. State of Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) 421, 15 L.Ed. 435

(1855); In re Clinton Bridge, 77 U.S. (10 Wall.) 454, 19 L.Ed. 969 (1870).

Thus, proper adjustment between the functions of the executive and judicial branches of the Government in the delicate field of foreign affairs is assured, a result entirely consistent with the constitutional purpose.

(f)

■ Finally, it is urged that the Amendment may not be constitutionally applied in the case at bar. The thrust of this contention is that application of the Amendment would retroactively deprive plaintiff of vested property rights without due process of law in violation of the fifth amendment.

At the outset there is serious doubt as to whether this plaintiff is entitled to the constitutional protection which it seeks. Plaintiff is an instrumentality of the Cuban government and stands in its shoes. For the purposes of this case at least, it is the Cuban government. Nothing has been called to my attention and I know of nothing to the effect that a foreign government is a "person" within the meaning of the due process clause and entitled to the constitutional protections which it affords. It is difficult to imagine that the Founding Fathers intended to shackle the political branches of the Government in their conduct of foreign affairs by granting such constitutional rights to foreign states.

But assuming that plaintiff is entitled to invoke the due process clause, the application of the Hickenlooper Amendment to the case at bar does not violate the Fifth Amendment.

Plaintiff goes on the theory that it acquired vested rights under the Supreme Court decision in Sabbatino which, once acquired, cannot be taken away by subsequent legislation. It relies on such cases as Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); Levy v. Wardwell, 258 U.S. 542, 42 S.Ct. 395, 66 L.Ed. 758 (1922); Forbes Pioneer Boat Line v. Board of Com'rs, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922); United States v. Klein, 80 U.S.

(13 Wall.) 128, 20 L.Ed. 519 (1871). But these cases and the theory on which they were decided are not apposite here.

In these cases rights were held to have become vested because transactions were involved which had been completed at a time when no substantive liability existed, or there was a contract with the Government for valid consideration, or judgment had been entered on the claim.[8] The parties could not be constitutionally deprived of such vested rights by subsequently enacted legislation.

Here, in contrast, plaintiff acquired no vested rights. Whatever rights it may have had arose entirely from expropriation by the Cuban government. If the expropriation is wrongful under international law now it was wrongful then. No judgment has been entered in plaintiff's favor. The expropriation was plainly not made in reliance upon the protections afforded by the act of state doctrine. But even had it been, that doctrine creates no property rights. The Hickenlooper Amendment creates no new liabilities. See Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659 (1937).

Here Congress has merely lifted a bar to consideration of pre-existing questions of substantive rights and liabilities. What the Amendment accomplishes is closely analogous to what a legislature does when it extends a statute of limitations. In such case retroactivity poses no constitutional infirmity, Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885), even though the extension of the limitations period is applied to pending cases. Wright v. Union Central Life Ins. Co., 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938); Graham & Foster v. Goodcell, 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415 (1931).

Chase Securities Corp. v. Donaldson, supra, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628, involving the extension of a state statute of limitations is closely analogous to this case. There judgment against the defendant was rendered by the state trial court. The judgment was reversed by the state appellate court on the ground that the statute of limitations barred the action. While the case was still pending in the trial court on remand the state legislature extended the statute of limitations so that it no longer barred the action. The state courts held that the new statute applied to the pending case and judgment was again entered against the defendant. In language that could almost have been written for the case at bar the Supreme Court held that such retroactive application of the statute did not violate the due process clause of the Fourteenth Amendment. The court said:

"They [statutes of limitation] are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right of what used to be called a 'natural' right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

\*    \*    \*    \*    \*    \*

"The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation. \*   \*   \* [i]t cannot be said that lifting the

---

8. It may be noted that the Supreme Court has on occasion upheld retroactivity of statutes despite the existence of judgments, both final and otherwise. Fleming v. Rhodes, 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947); American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921); District of Columbia v. Eslin, 183 U.S. 62, 22 S.Ct. 17, 46 L.Ed. 85 (1901).

bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is *per se* an offense against the Fourteenth Amendment. Nor has the appellant pointed out special hardships or oppressive effects which result from lifting the bar in this class of cases with retrospective force. This is not a case where appellant's conduct would have been different if the present rule had been known and the change foreseen. * * * The nature of the defenses shows that no course of action was undertaken by appellant on the assumption that the old rule would be continued. When the action was commenced, it no doubt expected to be able to defend by invoking Minnesota public policy that lapse of time had closed the courts to the case, and its legitimate hopes have been disappointed. But the existence of the policy at the time the action was commenced did not, under the circumstances, give the appellant a constitutional right against change of policy before final adjudication. Whatever grievance appellant may have at the change of policy to its disadvantage, it had acquired no immunity from this suit that has become a federal constitutional right." 325 U.S. at 314–316, 65 S.Ct. at 1142–1143.

See also Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

As was said in Johannessen v. United States, 225 U.S. 227, 242, 32 S.Ct. 613, 617, 56 L.Ed. 1066 (1912), "[T]here is no such thing as a vested right to do wrong."

The Cuban government could acquire no vested right by virtue of the expropriation if it was wrongful and certainly not a vested right to be protected against liability for such wrongful act by the bar of the act of state doctrine.

There are numerous cases in which legislation has been applied in various stages of pending litigation on facts without the same strong equities for retroactivity as exist here. E. g., Addison v. Huron Stevedoring Corp., 204 F.2d 88 (2 Cir.), cert. den., 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953); Thomas v. Carnegie-Illinois Steel Corp., 174 F.2d 711 (3 Cir. 1949) (collecting nearly 150 similar decisions at 712–713 and nn. 1–3); Darr v. Mutual Life Ins. Co., 169 F.2d 262 (2 Cir.), cert. den., 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415 (1948); Battaglia v. General Motors Corp., 169 F.2d 254 (2 Cir.), cert. den., 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948); Goddard v. Frazier, 156 F.2d 938 (10 Cir.), cert. den., 329 U.S. 765, 67 S.Ct. 124, 91 L.Ed. 659 (1946); Asselta v. 149 Madison Ave. Corp., 79 F.Supp. 413 (S.D.N.Y.1948).

The plaintiff here has received all the due process to which it was entitled. I hold that the application of the Amendment to the case at bar does not deprive the plaintiff of any vested rights in violation of the due process clause of the Fifth Amendment.

## IV.

### *The effect of the Amendment on this case.*

Remaining is the disposition to be made of the case at bar in the light of what has thus far been held.

The moving defendants urge that judgment should be entered in their favor dismissing the complaint. Their position is that the Court of Appeals in this case has already held that

"Since the Cuban decree of expropriation not only failed to provide adequate compensation but also involved a retaliatory purpose and a discrimination against United States nationals, we hold that the decree was in violation of international law." 307 F.2d at 868.

And that court went on to conclude that

"[S]ince the Cuban decree violated international law, the appellant's title is invalid and the district court was correct in dismissing the complaint." 307 F.2d at 869.

Defendants contend that since I have held the act of state doctrine as enunciated by the Supreme Court in Sabbatino to be inapplicable to this case under the Hickenlooper Amendment, this court is bound by the prior decision of the Court of Appeals, and without further inquiry on the merits, must give judgment for the defendants dismissing the complaint. Plainly I am bound by the decision of the Court of Appeals that the expropriation by the Cuban government violated international law. The opinion of the Supreme Court does not impair that holding. Its discussion of international law was limited to the question of compensation and did not relate to questions of discrimination and retaliation. 376 U.S. at 428–430, 84 S.Ct. 923.

But defendants' position fails to take into account one vitally important factor. The Amendment provides that it shall not be applicable

"in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court."

That exception is an integral and essential part of the Amendment. It must be given effect.

It is suggested that the views of the Executive Arm on this essential question have already been adequately expressed or, at the least, it has been indicated that the President does not desire to have a suggestion made to the court on his behalf here. I cannot agree.

In reaching its determination in this case the Court of Appeals relied on two letters, not before the district court, written by officers of the State Department, which it took to be evidence that the Executive Branch had no objection to a judicial testing of the validity of the Cuban decree.

Before the Supreme Court, however, it was made clear that these did not represent the official views of the Department and the brief on behalf of the Government urged that the act of state doctrine be applied. The Supreme Court so held.[9]

The position of the Executive Branch before Congress in opposition to the Hickenlooper Amendment has already been referred to.

Prior to the argument of the present motions counsel for the plaintiff formally requested that the President make a determination pursuant to the Amendment that the application of the act of state doctrine was required in this case by the foreign policy interests of the United States. Replying on the President's behalf the Acting Legal Advisor to the Secretary of State on November 27, 1964 said:

"We have been advised that in the opinion of the Department of Justice the cited provision is not applicable to the above case which, as you know, was decided by the Supreme Court under the name of Banco Nacional de Cuba v. Sabbatino prior to the passage of the amendment. Accordingly, the Department of State does not believe it is appropriate for the President to make any determination with respect to this case under section 620 (e) of the Foreign Assistance Act, as amended."

9. It may be noted, also, that the Supreme Court expressly declined to pass on the so-called Bernstein exception to the act of state doctrine predicated upon a letter from the Acting Legal Advisor to the State Department written for the purpose of relieving the court from any constraint upon the exercise of its jurisdiction to pass on the validity of the foreign decree involved in that case. 376 U.S. at 420, 84 S.Ct. 923; see Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246 (2 Cir.), cert. den., 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); Bernstein v. N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 173 F. 2d 71 (2 Cir. 1949), 210 F.2d 375 (2 Cir. 1954) (per curiam).

Thus, as far as the record in this case is concerned, the President has made no determination as to whether application of the act of state doctrine is required by the foreign policy interests of the United States. It appears that such a determination has been withheld upon the assumption, which I have now held to be erroneous, that the Hickenlooper Amendment did not apply to this case at all, and that the decision of the Supreme Court in Sabbatino remained applicable.

The United States on these motions urged that the Amendment did not apply to cases pending in the courts at the time of its enactment and thus would not apply to the case at bar. Its position is consistent with that taken by the Acting Legal Advisor of the Department of State in his letter of November 27, 1964.

It is plain to me that proper respect and consideration for the Executive Arm requires that the court give full opportunity to the President to make the determination provided for by the Amendment and if, in his wisdom he sees fit, to have a suggestion filed on his behalf that in this case application of the act of state doctrine is required by the foreign policy interests of the United States.

This is not a situation where the court should make assumptions as to what the presidential position may or may not be on the basis of a confusing and somewhat incomplete record. On the contrary, it is a fundamental intendment and purpose of the Amendment that the Executive Branch be given full opportunity to express its views if it so desires. To fail to give it that opportunity would nullify the protections expressly given by the Amendment to the interests of United States foreign policy.

I would assume that the Executive Arm will be able to make such a determination and to file a suggestion with the court as the Amendment provides if it so desires within sixty (60) days of the filing of this opinion. If more time is required the court should be so advised.

For these reasons determination of the question as to whether final judgment dismissing the complaint should be entered in this case will be withheld for a period of sixty (60) days for the purposes I have indicated.

It is so ordered.