**DOMINICUS AMERICANA BOHIO, a Limited Partnership, Dominicus Americana Cabana, a Limited Partnership, Four Worlds "B", a Limited Partnership, Four Worlds Marketing Co. Ltd., a Grand Cayman Corporation, Laguna, S.A., a Dominican Republic Corporation, Dominicus Americana, S.A., a Dominican Republic Corporation, Four Worlds Marketing Co. Inc., a Delaware Corporation, Dominicus Americana Development and Construction, S.A., Dominicus Americana Marketing, S.A., Dominicus Americana Management Co., S.A., all Dominican Republic Corporations, Dominicus Americana Development and Construction Company, Inc., Dominicus Americana Marketing Company, Inc., both Delaware Corporations, and M. Wayne Fuller, Individually,**

v.

**GULF & WESTERN INDUSTRIES, INC., a Delaware Corporation, Dominican Tourist Information Center, Inc., a New York Corporation, CostaSur Dominicana, S.A., Corporacion De Hoteles, S.A., both Dominican Republic Corporations, and "John or Jane Does" 1–5 and/or "Does Co. or Inc." 1–5, fictitious designations for parties, the actual identities of which presently are unknown, Defendants.**

No. 78 Civ. 4120 (RLC).

United States District Court,
S. D. New York.

July 11, 1979.

Lichtenberg & Goss, P.C., New York City by Murray Lichtenberg, New York City, for plaintiffs.

Simpson, Thacher & Bartlett, New York City by Charles E. Koob, New York City, for defendants Gulf & Western Industries, Inc., CostaSur Dominicana, S.A., Corporacion de Hoteles, S.A.

Burns, Jackson, Miller, Summit & Jacoby, New York City by Gary L. Maddock, New York City, for defendant Dominican Tourist Information Center.

## OPINION

ROBERT L. CARTER, District Judge.

This case involves the alleged monopolization of tourist facilities in the La Romana section of the Dominican Republic. The plaintiffs include one individual and a number of corporations, all affiliated in an endeavor to establish hotel and condominium accommodations there. Plaintiffs allege that they were hindered in these efforts by the illegal acts of the defendants, who own and operate existing tourist facilities in La Romana. The defendants are Gulf & Western Industries, Inc. ("G & W"), a number of its subsidiaries, and the Dominican Tourist Information Center. Plaintiffs assert causes of action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, as well as pendant common law claims of slander and unfair competition. They seek treble damages and injunctive relief prohibiting future unlawful activity by the defendants. The defendants now move to dismiss the complaint and plaintiffs have cross-moved for partial summary judgment. Both motions are premature and both are denied.

*Background*

Since approximately 1971, G & W has owned and operated a tourist resort called the CostaSur Complex in the La Romana area. In the same year Wayne Fuller, on behalf of the other plaintiffs, began to as-

semble nearby property in order to create a tourist facility named Dominicus Americána. Part of that project, the Club Dominicus, is now in operation. However, plaintiffs claim that the development of the entire facility has been delayed and disrupted by G & W, which purportedly covets the plaintiffs' beachfront property and hopes to squeeze out its potential competitors.

The supposed impetus for G & W's anticompetitive actions was a statement by its chairman, Charles G. Bluhdorn. When he first saw the plaintiffs' beachfront property while flying over it in a helicopter, Bluhdorn allegedly said, "Oh my God, we should have it." Plaintiffs claim that G & W has manifested this desire in a variety of ways. First, G & W allegedly interfered with construction of the Dominicus facility by preventing plaintiffs from using marina facilities in the La Romana area. According to the plaintiffs, they had obtained official approval to use a marina and had improved and expanded it. However, supposedly acting on the baseless complaints of G & W employees, a government official ordered that the marina facility be destroyed. Although this order was never carried out, its effect was to impede construction of the Dominicus facility.

Other allegations also involve G & W's alleged influencing of governmental action. For example, at G & W's behest, the Dominican government began in 1973 to study the possibility of creating a national park in the La Romana region. G & W purportedly encouraged and sponsored the creation of a special commission that recommended the expropriation of private land including that owned by plaintiffs. The Dominican government issued a decree endorsing the commission's proposal, but this decree was rescinded shortly thereafter when the government discovered that it involved confiscation of the Dominicus property.

Another claim concerns G & W's actions in relocating a roadway that was to serve the Dominicus complex. Plaintiffs assert that the Dominican Department of Public Works had planned construction of an oceanfront road and bridge that would con-

nect the city of La Romana with the Dominicus property. However, after a G & W engineer had proposed relocation of the road inland and G & W had agreed to assume the construction costs, the government abandoned the more direct beachfront route. Moreover, plaintiffs allege that G & W then deliberately delayed completion of the road in order to inhibit access to the Dominicus facility.

Plaintiffs also allege more direct anticompetitive actions by G & W employees. For example, plaintiffs claim that agents of G & W interfered with the transportation of necessary equipment and supplies to the Dominicus construction area by blockading the public road. Similarly, they allege that G & W encouraged local private transportation companies to boycott the Dominicus project. Plaintiffs also aver that G & W promoted and financed meritless litigation designed to cloud title to the land on which the facilities were being built. All of these tactics have purportedly delayed completion of the project.

Two of plaintiffs' allegations involve interference by G & W with plaintiffs' efforts to attract tourists to the Dominicus resort. First, plaintiffs allege that G & W employees convinced local officials to prohibit charter flights from landing at the La Romana Airport if they were transporting guests to the Dominicus complex. At the same time, authorities purportedly permitted similar planes carrying visitors to G & W's CostaSur complex to land. Second, plaintiffs claim that the Dominican Tourist Information Center, a nominally neutral organization sanctioned by the Dominican government, steered tourists away from Dominicus and encouraged them to visit CostaSur. The Center accomplished this by misrepresenting the nature of the Dominicus complex, excluding Dominicus representatives from promotional seminars, and giving the false impression that Dominicus was in fact owned by G & W.

A number of less specific anticompetitive actions are also alleged. The Dominican Ministry of Tourism, now headed by a former G & W official, supposedly delayed

approval for a number of the steps involved in construction of the Dominicus facility in order to give the CostaSur project a competitive advantage. In addition, G & W employees are said to have slandered plaintiff Wayne Fuller in order to damage the reputation of the businesses with which he is associated. Finally, plaintiffs allege that defendants corrupted and intimidated both government officials and private individuals in furtherance of their anticompetitive goals.

*Legal Arguments*

The defendants' omnibus motion advances a number of grounds for dismissing the entire complaint. First, G & W contends that Dominicus has not averred and cannot demonstrate that the acts alleged place a substantial burden on interstate commerce sufficient to support jurisdiction under the antitrust laws. G & W goes on to argue that even if a minimal effect on the foreign commerce of the United States can be shown, the major impact of the allegedly illegal acts is on the economy of the Dominican Republic. Therefore the defendants urge that as a matter of international comity this court should abstain from taking jurisdiction.

According to G & W, the act of state doctrine constitutes a second basis for dismissing this action. G & W characterizes the complaint as claiming that defendants improperly influenced officials of the Dominican Republic to take actions detrimental to plaintiffs. Such governmental actions, however, are said to be immune from judicial scrutiny. Moreover, G & W argues that even if the plaintiffs are not directly challenging the validity of the governmental acts, they must nevertheless prove that their damages resulted directly from Sherman Act violations, and this would require an analysis of the motivation of the government officials which the act of state doctrine forbids. Although G & W concedes that some of its alleged illegal acts may not be protected by the doctrine, it nevertheless urges that those allegations involving governmental acts be stricken from the complaint.

G & W next argues that the plaintiffs' definition of the relevant market as "the provision of the first-class transient or permanent tourist and recreation facilities . . . in the City of La Romana and its environs" is fatally defective. According to G & W, tourists seeking a vacation at a beach resort would consider facilities throughout the Caribbean, Florida, and parts of Mexico and South America. Since the defendants could not possibly monopolize tourist facilities in this broadly defined market, the complaint should be dismissed.

G & W also makes a series of more limited arguments, the first being that many of the plaintiffs do not have standing to sue under the antitrust laws. Defendants claim that most of the plaintiff corporations are affected only indirectly by the acts of the defendants and are therefore not within the target area of any of the alleged antitrust violations. These plaintiffs with only an attenuated interest in the litigation include owners of the Dominicus land that do not actually operate any facilities, subcontractors that had arranged to provide goods and services to the facilities, and construction companies that allegedly lost profits or were unable to make public offerings of securities because of delays in the project. In addition, G & W claims that all of the damages claimed by the plaintiffs are too speculative to warrant relief under the antitrust laws because the Dominicus project was not sufficiently close to realization.

Two defendants, CostaSur Dominicana, S.A. and Corporacion de Hoteles, S.A., move to be dismissed from the action on the ground that the court lacks personal jurisdiction over them. They are Dominican corporations that claim to transact no business in New York. The mere allegation that they engaged in a conspiracy with the other defendants is an insufficient basis for asserting jurisdiction over them since they are not alleged to have committed any acts in furtherance of the conspiracy in New York.

G & W next contends that the allegations of fraud, corruption and conspiracy contained in the complaint should be stricken

for failure to plead them with sufficient specificity. This argument is based on Rule 9(b), F.R.Civ.P., which requires such charges to be set forth with particularity and supported by factual detail.

Finally, the Dominican Tourist Information Center argues that the charge that it engaged in a conspiracy with G & W must be dismissed, since plaintiffs have alleged that the Center is in fact a subsidiary of G & W. The Center urges that a conspiracy can only exist between independent entities.

The plaintiffs' motion for partial summary judgment focuses solely on the applicability of the act of state doctrine. They claim that the evidence shows that the acts taken by officials of the Dominican government were done at the behest of G & W and did not represent national policy. Therefore, it is appropriate to preclude G & W from interposing any defense based on the act of state doctrine.

*Discussion*

I. Subject Matter Jurisdiction

In a 1909 opinion by Justice Holmes, the Supreme Court cast doubt on the applicability of the antitrust laws to actions outside the territory of the United States. *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909). If that case were still good law, I would not hesitate to dismiss the complaint here for lack of subject matter jurisdiction. However, history has proven *American Banana* to be not a seminal decision but an aberration: it is apparently the only foreign trade antitrust case lost by the Department of Justice for want of jurisdiction. There is now broad agreement that its holding on the issue of jurisdiction is obsolete.[1] *See Hunt v. Mobil Oil Corp,* 550 F.2d 68, 74 (2d Cir. 1977); *Timberlane Lumber Co. v. Bank of America, N. T. & S. A.,* 549 F.2d 597, 608 n.12 (9th Cir. 1976); Kintner & Griffin, *Jurisdiction Over Foreign Commerce Under the Sherman Antitrust Act,* 18 B.C.Indus. & Com.L.Rev. 199, 208 (1977); McManis,

*Questionable Corporate Payments Abroad: An Antitrust Approach,* 86 Yale L.J. 215, 232 (1976).

The demise of *American Banana* coincided with the recognition that the strong public policy embodied in the antitrust laws would be undermined if extraterritorial jurisdiction were denied. *See Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance,* 451 F.2d 727, 729 (2d Cir. 1971). Consequently, the "effects test," first promulgated by Judge Learned Hand in *United States v. Aluminum Co. of America ("Alcoa"),* 148 F.2d 416 (2d Cir. 1945), gained acceptance. According to the *Alcoa* rule, even wholly foreign conduct may come within the sweep of the antitrust laws if it has a sufficient effect on the interstate or foreign commerce of the United States. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704–05, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Indeed, it is probably not necessary for the effect on foreign commerce to be both substantial and direct as long as it is not *de minimus. See Timberlane Lumber Co. v. Bank of America, N. T. & S. A., supra,* at 610–11, 613, 615; Kintner & Griffin, *supra,* at 204–05; Rahl, *Foreign Commerce Jurisdiction of the American Antitrust Laws,* 43 Antitrust L.J. 521, 523 (1974).

However, the effects test alone is inadequate, because it fails to take into account potential problems of international comity. *See Timberlane, supra,* at 611–12; *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1291–1292 (3rd Cir. 1979); Note, *Sherman Act Jurisdiction and the Acts of Foreign Sovereigns,* 77 Colum.L. Rev. 1247, 1250 (1977). Accordingly, the proper standard is a balancing test that weighs the impact of the foreign conduct on United States commerce against the potential international repercussions of asserting jurisdiction. In some cases, this analysis has been used to determine whether subject matter jurisdiction exists in the first instance. *See Mannington Mills, supra,* at 1299–1300 (Adams, J., concurring); *Timber-*

---

1. *American Banana*'s holding with regard to the act of state doctrine, however, is still very

much alive. *See Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 74 (2d Cir. 1977).

688

*lane, supra*, at 613. In others, the courts have first used the effects test alone to decide if jurisdiction is proper and then applied the foreign relations impact factors to determine if abstention would nevertheless be appropriate. *See Mannington Mills, supra*, at 1294–1298 (majority opinion). Regardless of whether considerations of international comity are reviewed as part of the threshold jurisdictional decision or in connection with a subsequent determination regarding abstention, the record in the case at bar is insufficient for a thorough review of all the relevant factors.

█ Where the record does address any of the key elements, it supports jurisdiction. For example, the antitrust laws are more likely to apply if the challenged conduct affects commerce that originated in the United States. *See Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance, supra*, at 729; *Todhunter-Mitchell & Co. v. Anheuser-Busch, Inc.*, 383 F.Supp. 586, 588 (E.D.Pa.1974). Although the cited cases dealt with the export of products to be used by foreign consumers, they are not distinguishable for that reason from the instant case where the consumers themselves were "exported" to take advantage of the services provided in the Dominican Republic. *See* Kintner & Griffin, *supra*, at 203 (antitrust laws apply to transportation and communications between United States and foreign countries). Similarly, the fact that many of the defendants as well as the plaintiffs are United States corporations, that the services said to be affected by the antitrust violations are used by Americans, and that some of the anticompetitive conduct is alleged to have occurred in this country all militate in favor of finding that subject matter jurisdiction exists. *See Continental Ore Co. v. Union Carbide & Carbon Co., supra*, at 705–07 (American parties and conspiracy within United States); *United States v. Sisal Sales Corp.*, 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042 (1927) (conspiratorial acts within United States); *Sul-*

*meyer v. Seven-Up Co.*, 411 F.Supp. 635, 639 (S.D.N.Y.1976) (Stewart, J.) (American corporations and anticompetitive acts in United States); *Fleischmann Distilling Corp. v. Distillers Co.*, 395 F.Supp. 221, 227 (S.D.N.Y.1975) (Carter, J.) (impact on American consumers).

█ Thus, the record provides some information regarding a few of the ten factors relevant to the issue of jurisdiction. *See Mannington Mills, supra*, at 1297; *Timberlane, supra*, at 614–15. However, discovery is necessary to elucidate the following elements which are relevant to the foreign relations issue: the degree of conflict with foreign law, the relative importance of the alleged antitrust violations in the Dominican Republic, the availability of a remedy there, and the existence of any agreement between the United States and the Dominican Republic regarding antitrust policy.[2] Naturally, the defendants must bear the burden of demonstrating that foreign policy considerations outweigh the need to enforce the antitrust laws where the foreign commerce of the United States is affected.

## II. Act of State

█ The act of state doctrine forbids judicial inquiry into the validity of an act of a foreign government. The doctrine was first promulgated in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), where the Supreme Court said:

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."

More recently, the Court restated the purposes of the doctrine as follows:

"The major underpinning of the act of state doctrine is the policy of foreclosing

**2.** Other factors listed in the *Mannington Mills* case also seem to support the plaintiffs' position. For example, it would clearly be possible for this court to make its order effective as against the American corporate defendants, and such relief need not be in conflict with the laws of the Dominican Republic.

court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations."

*Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 697, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976), citing *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427–28, 431–33, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

In the extreme case, a lawsuit that challenges the validity *per se* of an act of a foreign government is non-justiciable. *Alfred Dunhill of London, Inc. v. Republic of Cuba, supra,* 425 U.S. at 697, 96 S.Ct. 1854; *Hunt v. Mobil Oil Corp., supra,* at 77. Some commentators have argued that this should be the only situation covered by the act of state doctrine, and that private acts aimed at instigating government action to restrain trade should not be immune from judicial scrutiny. *See e. g.,* Davidow, *Antitrust, Foreign Policy, and International Buying Cooperation,* 84 Yale L.J. 268, 282–83 (1974). It has been persuasively argued that any broader application of the act of state doctrine would invite antitrust conspirators to involve foreign governments in the anticompetitive scheme in order to procure the virtual immunity that would result. Note, *supra,* 77 Colum.L.Rev. at 1260.

However, the Second Circuit has not limited the act of state doctrine to cases challenging the legality of foreign governmental acts. Rather, it has held that if it is necessary to inquire into the motivation of an act of a foreign government harmful to the plaintiff in order to establish that that decision was instigated by a private defendant, the act of state doctrine will apply. *Hunt v. Mobil Oil Corp., supra,* at 76–77. *Cf. Occidental Petroleum Corp. v. Butte Gas & Oil Co.,* 331 F.Supp. 92 (C.D.Cal. 1971), *aff'd,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).

Despite the broad construction given to the act of state doctrine by the Second Circuit, it is clear that many of the acts alleged in the complaint in this case fall outside its penumbra. For example, the claim that G & W employees fostered a boycott of the Dominicus facility by local private transportation companies implicates no government action. Likewise, neither the allegation that G & W blocked the access road to Dominicus to inhibit construction nor the claim that it slandered the project's principal entrepreneur involves any act by the Dominican authorities. Finally, the Dominican Tourist Information Center, although operating under a government sanction, is apparently a private enterprise not entitled to immunize its own conduct with the act of state doctrine. Thus, the claim that the Center conspired with G & W to steer tourists to CostaSur and away from Dominicus is subject to judicial scrutiny.

Some of the other allegations of the complaint, although involving acts of the Dominican authorities to some extent, fall within well-recognized exceptions to the act of state doctrine. For example, the initiation of judicial proceedings in a foreign country is not encompassed by the act of state doctrine even though foreign courts are responsible for the ultimate outcome of the proceedings. *Timberlane, supra,* at 608. Thus, the allegation that G & W officials promoted and financed meritless litigation designed to cloud the title to the Dominicus property presents a justiciable issue.

The allegations that involve acts by Dominican authorities performing arguably commercial functions present a more difficult problem. In order to trigger application of the act of state doctrine, the government act concerned must be a public one such as a legislative enactment, regulatory decree, or executive use of the police powers. *See* McManis, *supra,* at 236–37; *cf. Continental Ore, supra,* at 706–07 (corporation acting through agent of foreign government but without government's official approval; act of state inapplicable). Four members of the Supreme Court concluded in *Alfred Dunhill of London, Inc. v. Republic of Cuba, supra,* 425 U.S. at 693–95, 706, 96 S.Ct. 1854, that conduct related to

commercial endeavors is not immunized by the doctrine, and the Second Circuit adopted this position in *Hunt v. Mobil Oil Corp., supra,* at 73. It is problematic whether closing the LaRomana airport to the plaintiffs, ordering their marina to be dismantled, and rerouting the road that would serve Dominicus—all acts alleged to have been part of a conspiracy to injure Dominicus' business—were acts engaged in pursuant to the police power of the authorities or acts of a commercial nature. It would be inappropriate to make such determinations on the present record without permitting discovery.

■■■■■ Even the allegation that seems at first blush to fall squarely within the act of state doctrine may in fact be governed by an exception. The expropriation by the Dominican government of plaintiffs' property in order to create a national park would appear to be a quintessential public act. However, an act that would otherwise be immune from judicial inquiry may lose its privileged status if the government repudiates it. *See Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. at 432, 84 S.Ct. 923. Here, plaintiffs allege that the Dominican government, realizing that it had been duped by G & W, rescinded its confiscation order as soon as it discovered that the land involved was the Dominicus property. Moreover, even an unrepudiated act of state may be scrutinized by the courts if

it resulted from the corruption of government officials. *Hunt v. Mobil Oil Corp., supra,* at 79. *See also* McManis, *supra,* at 236–37; Note, *supra,* 77 Colum.L.Rev. at 1262. The allegations here that government actions were procured by fraud and coercion thus suffice to preclude application of the act of state doctrine even to the expropriation issue at this stage of the litigation.[3]

### III.   Market Definition

■■■■■ The defendants' contention that the complaint asserts a fatally defective definition of the relevant market also cannot be assessed on the basis of presently available evidence. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–4, 8 L.Ed.2d 510 (1962). Without some evidence regarding the cross-elasticity of demand between tourist accommodations in La Romana and vacation facilities in other warm weather resorts, the court is wholly unable to make a rational evaluation of the plaintiffs' market definition. The court cannot simply take judicial notice that tourists would be equally happy vacationing in Acapulco as they would be traveling to the Dominican Republic.[4] This is particularly true because the Supreme Court has held that within any

3. Defendants also argue in a footnote to their brief that any attempts they made to influence the decisions of the Dominican government are protected by the *Noerr-Pennington* doctrine. *See United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.,* 365 U.S. 127, 31 S.Ct. 523, 5 L.Ed.2d 464 (1961). It is an open question whether that doctrine, which protects legitimate attempts to petition the United States government, has any application to the lobbying of foreign governments. *See Occidental Petroleum Corp. v. Butte Gas & Oil Co.,* 331 F.Supp. 92, 107–08 (C.D.Cal.1971), *aff'd,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972) (rationale of *Noerr-Pennington* inapplicable to acts in foreign countries); McManis, *Questionable Corporate Payments Abroad: An Antitrust Approach,* 86 Yale L.J. 215, 240 (1976). In any

event, the doctrine does not immunize any lobbying effort that is "[a] sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *California Motor Transport Co. v. Trucking Unltd.,* 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972), quoting *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc., supra,* 365 U.S. at 144, 31 S.Ct. 523. Certainly the corrupt and coercive practices alleged by plaintiffs in the instant case would fall within the sham exception to the *Noerr-Pennington* doctrine. *See* Costilo, *Antitrust's Newest Quagmire: The Noerr-Pennington Defense,* 66 Mich.L.Rev. 333, 350–51 (1967).

4. As plaintiffs have pointed out, G & W has expended substantial sums in advertising the uniqueness of La Romana in order to attract tourists to its CostaSur complex. Although

market as defined above, "submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Ibid.* Thus, even if the general product market were defined to include tourist facilities throughout the entire Caribbean area, accommodations in LaRomana might compose an appropriate submarket.[5] *Cf. United States v. Pabst Brewing Co.,* 384 U.S. 546, 36 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (although general market was United States, three-state region constituted submarket). The plaintiffs, then, cannot be precluded from introducing evidence that will support their market definition.

## IV. Standing

Defendants next contend that many of the plaintiff corporations lack standing because any injuries they may have suffered were at most an indirect and incidental result of the alleged anticompetitive conduct. According to the defendants, only Dominicus Americana Bohio, which operates the Dominicus facility, is in a position to assert antitrust claims. The other plaintiffs, including subcontractors for construction work at Dominicus, corporations with long-term options to develop facilities there in the future, holders of leasehold or fee interests in the Dominicus property, and companies with contracts to manage Dominicus Americana and develop its tourist trade, are purportedly without standing because they are beyond the "target area" of the illegal conduct. *See Long Island Lighting Co. v. Standard Oil Co.,* 521 F.2d 1269, 1274 (2d Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2d Cir. 1970). Plaintiffs do not dispute the aptness of the target area test, but they argue that they were in fact within the defendants' line of fire.

The defendants' argument generalizes too broadly from cases that are highly fact-sensitive. For example, they cite *Calderone Enterprises Corp. v. United Artists Theatre Circuit,* 454 F.2d 1292 (2d Cir. 1971), for the proposition that a non-operating landlord cannot bring an antitrust action for acts directed solely against its tenant. But the *Calderone* court recognized that if the defendant in that case had aimed its conspiracy at the landlord in some way, then the landlord could have had standing. *Id.* at 1296. In the instant case, plaintiffs argue that G & W directed its illegal acts in part at the owners of the Dominicus property, first by stirring up meritless litigation to cloud title and, second, by instigating the expropriation by Dominican authorities. Thus, the nexus between the allegedly illegal acts and the property owner that was missing in *Calderone* is present in this case. Similarly, although companies that merely have construction or management contracts with the target of an antitrust violation may not normally have standing to sue, the plaintiffs in the instant case allege that they were the direct targets of the defendants' illegal acts, because G & W prevented the transportation of building supplies and equipment and fraudulently diverted tourists from Dominicus to CostaSur.

Furthermore, in contrast to cases like *Billy Baxter* and *Calderone,* the plaintiff corporations here were evidently created specifically for the purpose of developing the Dominicus project. If it is established that all of the plaintiffs are engaged in this single enterprise and have few business relationships unrelated to Dominicus, then they may well be within the target area of the alleged anticompetitive conspiracy. *See Sulmeyer v. Seven-Up Co., supra,* at 638–39.

---

this is hardly a waiver of the defendants' right to challenge the plaintiffs' market definition, it does demonstrate that all warm weather vacation facilities may not be equally interchangeable.

5. Although it seems at first glance that the parties are disputing the relevant geographic market, in fact the disagreement is over the definition of the product market. Definition of geographic market requires an analysis of the

region where consumers purchase the products at issue. In this case, the relevant geographic market is presumably the northeastern United States, the area from which both the plaintiffs and the defendants draw their customers. Because of the unique nature of tourist services, the location of the facilities themselves is actually a geographic component of the definition of the product market.

Finally, the contention that the plaintiffs' damages are too speculative to give rise to a cause of action is without merit. The mere fact that some of the corporate plaintiffs have not yet begun operation is not dispositive, as long as they can demonstrate their intention to enter the field and their preparedness to do so. *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 994–95 (D.C.Cir.1977). It would be anomalous to hold otherwise, since any monopoly that succeeded in erecting an absolute barrier to competition would then be immune from private antitrust suits since its potential competitors would be barred from seeking relief.

It is thus improper to dismiss any of the plaintiffs on standing grounds before discovery has taken place. *Cf. Billy Baxter, Inc. v. Coca-Cola Co., supra*, at 189 (complaint dismissed for want of standing after two years of discovery). Although defendants may yet be able to demonstrate that some of the plaintiffs were not within the target area of the alleged antitrust violations, it would be premature to make any such determination now.[6]

### V. Personal Jurisdiction

Two of the corporate defendants, CostaSur Dominicana, S.A. and Corporacion de Hoteles, S.A., argue that this court lacks personal jurisdiction over them. They claim to be Dominican corporations that do no business in New York. Without reviewing the full range of arguments made by both parties on this issue, it is sufficient to note that there is a crucial issue of fact that precludes summary judgment. It is beyond dispute that a corporation may be held to be transacting business for purposes of jurisdiction and venue wherever a general agent acts on its behalf. This principle has been consistently reaffirmed in the context of antitrust litigation. *See United States v. Scophony Corp.*, 333 U.S. 795, 810–17, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *Hunt v. Mobil Oil Co.*, 410 F.Supp. 4, 8–9 (S.D.N.Y. 1975) (Weinfeld, J.), *aff'd*, 550 F.2d 68 (2d Cir. 1977); *Sunrise Toyota Ltd. v. Toyota Motor Co.*, 55 F.R.D. 519, 524 (S.D.N.Y. 1972) (Lasker, J.). Moreover, the transactions executed in the forum by the defendant need have no relation to the illegal acts alleged. *See Star Lines, Ltd. v. Puerto Rican Maritime Shipping Authority*, 442 F.Supp. 1201 (S.D.N.Y.1978) (Carter, J.).

Here, plaintiffs have submitted an affidavit from one of their attorneys indicating that he was informed by representatives of G & W that Rolando Bunster, G & W's Special Assistant for Latin American Affairs in New York, is general agent for CostaSur and Hoteles. Bunster has submitted an affidavit denying that he serves in such a capacity. Without additional discovery with respect to the precise functions performed by Bunster, the court can make no ruling dismissing the claims against these defendants.[7]

### VI. Allegations of Fraud and Corruption

Defendants next argue that the allegations of fraud and corruption contained in the complaint be stricken for failure to plead them with the specificity required by Rule 9(b), F.R.Civ.P. The particularity requirement of the rule affords a defendant the information he needs to respond to the allegations and protects his reputation from irresponsible charges. *See Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir. 1972); *Robertson v. Nat'l Basketball Ass'n*, 67 F.R.D. 691, 695 (S.D.N.Y.1975) (Carter, J.). Accordingly, a plaintiff is generally required to plead the time, place, and contents of any allegedly false representations

---

**6.** There is some danger that the multiple plaintiffs have made duplicative demands for damages. However, this problem need not be resolved until the initial question of liability has been determined.

**7.** In a footnote in defendants' brief, it was also asserted that CostaSur and Hoteles had not been properly served with the summons and complaint. However, subsequent to the filing of that brief, plaintiffs have filed affidavits of service with respect to both corporations. It thus appearing that the plaintiffs have complied with the requirements of Rule 4, F.R. Civ.P., the motion to dismiss for failure to provide these defendants with proper notice is denied.

as well as the identity of the person making those representations. *Robertson v. Nat'l Basketball Ass'n, supra,* at 697.

■ However, the strict requirements of Rule 9(b) are addressed primarily to the situation where the plaintiff was defrauded directly by the defendant. Where a plaintiff is claiming instead to have been injured as the result of a fraud perpetrated on a third party, the circumstances surrounding the transaction are peculiarly within the defendant's knowledge. Therefore, the requirement of particularity will be relaxed, and the plaintiff is entitled to rely on information and belief in support of the allegations. *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir. 1974); *Segal v. Gordon, supra,* at 608; *Robertson v. Nat'l Basketball Ass'n, supra,* at 698.

■ In the complaint in this action, the plaintiffs have presented some facts from which an inference of fraud or corruption could be drawn. They have pointed out that they were barred from using an airport that the defendants were permitted to utilize, that a commission (one member of which was an officer of a G & W subsidiary) recommended the expropriation of the plaintiffs' property, and that inaccurate information regarding the Dominicus facility was disseminated by the Dominican Tourist Information Center at a time that the Center was in close contact with an officer of G & W. Such facts hardly establish the existence of fraud or corruption, but they indicate that the plaintiffs' allegations are not wholly imaginary. Therefore, defendants' motion to strike the allegations of fraud and corruption will be denied at this time with leave to renew it if the plaintiffs are unable to support their charges after they have been afforded an opportunity for discovery.

VII. Conspiracy Claims

■ The defendant Dominican Tourist Information Center reiterates the arguments made by the other defendants and also asserts that the complaint fails to state a proper conspiracy claim against it. This latter contention is based on the plaintiffs' characterization of the Center as being un-

der the complete control of G & W. The Center argues that it cannot be liable for joining in a conspiracy with G & W, because two elements of a single entity are incapable of conspiring with each other. However, the Center has submitted no evidence indicating it is formally a branch of G & W's corporate organization. Until the relationship between the Center and G & W is clarified, the conspiracy allegations cannot be dismissed.

*Conclusion*

■ Summary judgment is seldom appropriate in complex antitrust cases, and it is particularly difficult to justify the dismissal of such a case prior to discovery. *See Poller v. Columbia Broadcasting, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Although the parties in the instant case may renew their motions after discovery has been completed, there is no basis for granting summary judgment at this time. Accordingly, the defendants' motions are denied in all respects, and the plaintiffs' motion for partial summary judgment is also denied.

IT IS SO ORDERED.