**FAYSOUND LIMITED, Plaintiff,**

v.

**WALTER FULLER AIRCRAFT SALES, INC. and Falcon Jet Corporation, Defendants.**

**No. LR-C-89-834.**

United States District Court,
E.D. Arkansas, W.D.

Oct. 29, 1990.

**1366**

Vince Foster, Jr. and Jess Askew, III, Rose Law Firm, Little Rock, Ark., for plaintiff.

Friday, Eldredge & Clark, Little Rock, Ark., for Walter Fuller Aircraft Sales, Inc.

Putnam & Roberts, New York City, and Dover & Dixon, Little Rock, Ark., for Falcon Jet.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

### I. STATEMENT OF FACTS

Faysound Limited ("Faysound"), a Hong Kong corporation, purchased a Falcon aircraft, the subject of this lawsuit, from the manufacturer at a cost of over nine million dollars. The plane was then leased to a Philippine corporation, United Coconut Chemicals ("UNICHEM") for a period of five years on October 23, 1982. Paragraph 6.1 of the lease agreement reads as follows:

> The aircraft may be used anywhere in the world and for this purpose the LESSEE may register the aircraft under the pertinent laws of such country as may be selected by the LESSEE. It is understood and agreed that the LESSEE is authorized by the LESSOR to register the aircraft under Philippine Registry. For this purpose, the LESSOR, upon request of the LESSEE, or the LESSEE itself, may cause the cancellation of the registration of the aircraft under any foreign registry.

(PX MM). The plane was then registered with the Philippine Bureau of Air Transportation on November 2, 1982, for use in the Philippines. UNICHEM's status was noted by striking the word "owner" and inserting the word "operator" above it. (*Id*). The original certificate registered the Falcon as "Name of operator: United Coconut Chemical, Inc. (Lessee)." *Id.*

The back of the certificate had the following entry:

> Aircraft herein registered is subject to the Lease Agreement entered into by and between FAYSOUND, LTD., a corporation organized and existing in accordance with the laws of Hong Kong (Owner–Lessor) and UNITED COCONUT CHEMICALS, INC., a corporation organized with the laws of the Philippines with principal address, offices at UCPB Bldg., Makati, M.M. (Operator–Lessee). (Contract of Lease on file).

(PX LL). For the next five years, which comprised the entire term of the lease, UNICHEM renewed its registration of the Falcon. (PX NN, OO, PP and QQ). The same entries were made in Bureau registration records.

The former Philippine President, Ferdinand Marcos, fled the Philippines on February 25, 1986. His successor, Corazon Aquino, created the Philippine Presidential Commission on Good Government ("PCGG") and charged it with the task of recovering ill-gotten assets of former President Marcos and his close associates. On June 19, 1986, the PCGG issued a Writ of Sequestration against one Eduardo Cojuangco, Jr., describing several aircraft including the Falcon. (PX SS). Cojuangco was a multimillionaire businessman with substantial interest in UNICHEM and undoubtedly a close friend and adviser to Marcos. The Writ of Sequestration did not name Faysound nor was it served upon its agent.

(PX YY). The writ therefore created no legitimate basis under Philippine law for the PCGG to seize any asset of Faysound. (PX WW at pp. 9–13). After the plane was sequestered, UNICHEM renewed the registration with the Philippine Civil Aircraft Registry for the last year of the lease on October 30, 1986. (PX QQ).

On July 31, 1987, the PCGG instituted action against Eduardo Cojuangco, Jr. to recover his ill-gotten wealth. The complaint was filed in the Sandiganbayan Court, the special Philippine court established to adjudicate cases brought by the PCGG to recover ill-gotten assets, and assigned Civil Case No. 033. The complaint did not name Faysound nor any of the lessees of the Falcon. (PX YY, 9). The Falcon remained in the PCGG custody, but there was no further action (PX WW). Faysound instituted demands on its lessees for redelivery of the Falcon. (PX KK). On August 2, 1988, the authority of the PCGG to issue sequestration orders lapsed, and under Philippine law any prior sequestration order upon which no judicial action was filed before August 2, 1987 was "deemed automatically lifted." Because no action was filed against the lessee or owner of the Falcon, as a matter of Philippine law, the writ of sequestration was deemed lifted on August 2, 1987.

The Falcon sat at the Villamo Air Base in the Philippines and began to deteriorate. The PCGG began efforts to sell the plane. It is not necessary to go into the efforts to sell the plane. Several prospects emerged, and efforts finally culminated in a sale to the defendant Walter Fuller Aircraft Sales, Inc. ("Fuller"). It is not necessary to a decision on the summary judgment issue to examine all of these negotiations. Suffice it to say that there is a strong aroma of corruption and bribery in connection with the sales efforts of PCGG.

The PCGG ultimately determined that it would be necessary to obtain the Sandiganbayan Court's approval of the sale of the Falcon (PX WW). As that court noted in its opinion:

> [I]t appeared that the Solicitor representing the plaintiff did not know too many details about the relationship of the aircraft and the United Coconut Chemicals, Inc. (UNICHEM).
>
> It appears that UNICHEM is not a sequestered company but rather a company where only the shareholdings of defendant Eduardo Cojuangco, Jr. have been sequestered. ... It likewise appears that UNICHEM had not been furnished with a copy of the instant Motion and that it had not been intended to be so furnished (the notices were addressed only to defendant Cojuangco's lawyers of record). The consideration of said motion was, therefore, deferred.

*Id.* at 2.

After the Sandiganbayan Court deferred consideration of the PCGG's first Motion to sell the Falcon, the PCGG filed a motion for early Resolution of its Motion to Sell on April 5, 1989. *Id.* This Motion was set for hearing on April 14, 1989. *Id.* at 3. The PCGG argued that the Sandiganbayan Court did not need to resolve issues concerning the validity of the sequestration or questions concerning whether Cojuangco, the named defendant in the sequestration case, even owned the Falcon. *Id.* The Sandiganbayan Court rejected the PCGG's argument:

> The Court is unable to respond positively to plaintiff's position.
>
> Unquestionably, neither the issue of the ownership of the aircraft nor the propriety of the sequestration thereof has been raised in the pleadings before the Court with regard to the motion to sell the aircraft in question.
>
> Invocation, however, of the power of the court to authorize the disposition of a sequestered asset or a seized property (the sequestration or seizure of which was not upon this Court's authority) must necessarily, though perhaps implicitly, include a plea for the affirmance of the propriety of that seizure. And were there no reason for this Court to doubt the original seizure, then this Court would, as it must, accord the PCGG the rebuttable presumption of regularity in its act.
>
> The plaintiff-movant through the PCGG itself, however, has presented this Court

with the facts which serve to dilute the presumption of regularity which this Court would accord the PCGG's own acts, namely:

(1) The aircraft in question is apparently NOT owned by UNICHEM;

(2) It is apparently NOT owned by defendant Cojuangco either but, upon plaintiff's own admission, by "Faysound." Certainly no averment has been made either by PCGG or anybody else to prove false the data on the Certificate of Registration of that aircraft to that effect;

(3) UNICHEM itself is not a sequestered corporation (only the shares of stock therein owned by defendant Cojuangco appear to have been sequestered);

(4) The lease over the aircraft, according to the plaintiff itself, lapsed (in 1987) more than two years ago;

(5) The renewal of the Certificate of Registration issued by the Bureau of Air Transportation on October 30, 1986, *four* months AFTER this and other aircraft had been ordered sequestered per writ of sequestration on file with this Court.

There is, then, every indication on the very face of the pleadings of plaintiff-movant and the allegations in open Court that the sequestration of the aircraft now sought to be sold was not in order. It is true that no one, not even the lessor has come to Court nor, as far as this Court is properly informed, has anyone sought to question the propriety of the plaintiff's (or PCGG's) seizure thereof anywhere else. This silence from others who may be parties in interest to this aircraft, however, does not justify authorization of the projected sale of that aircraft when it becomes apparent that the premises for such an authorization do not exist—in this instance, a valid sequestration.

*Id.* at pp. 3–5 (footnote omitted).

The PCGG, through the Solicitor General, had argued the Court need not concern itself with who owned the Falcon because that could be resolved later. The Court was unimpressed:

It will not do to say that the issue of ownership can be taken up later when the case proceeds to trial since one of the issues, even now, remains the *prima fa-cie* propriety of PCGG's seizure thereof which PCGG now makes abundantly apparent to have been absent.

*Id.* at 5.

After the hearing on the PCGG's Motion for Early Resolution on March 14, 1989, the PCGG reversed its earlier position that it required Sandiganbayan Court approval to sell the Falcon. *Id.* at 7. The Sandiganbayan Court attributed this about-face to the fact that the PCGG knew Court approval of the proposed sale was unlikely:

The Motion to Sell the aircraft was heard on April 14, 1989 where very pointed questions were asked by the Court about the propriety of the sequestration of the aircraft *in question and the resulting propriety of selling the same.* Until that date the PCGG acknowledged its need for court authority before selling this aircraft.

*Id.*

Accordingly, on April 27, 1989, the Philippine Solicitor General filed a Motion to Withdraw the PCGG's earlier request for authority to sell the Falcon at the request of PCGG Commissioner DeLeon. *Id.* The Sandiganbayan Court initially viewed the Motion to Withdraw as a decision by the PCGG not to sell the Falcon. *Id.* The Sandiganbayan Court stated:

The Motion to Withdraw can and could only be viewed as a desistance by the PCGG from the original plan for the sale of the aircraft. Rather than issue a resolution pointing out the breach by the PCGG of the basic precepts of fairness, justice and due process, the Court acceded to the withdrawal of the motion and deemed the matter of the proposed sale moot and academic.

*Id.* But DeLeon and his fellow commissioners at the PCGG had not in fact abandoned the sale; instead, the PCGG publicly acknowledged that it intended to sell the Falcon "sans court consent." *Id.* In addition, according to the Sandiganbayan Court's opinion, Tony Daguna, the lawyer for International Enterprises, Inc., learned of the Sandiganbayan Court's accession to the motion to withdraw "even before the process servers of the Court had served the

resolutions granting the withdrawal." *Id.* at 8.

This inside knowledge and the PCGG's about-face greatly disturbed the Sandiganbayan Court. In the words of the justices of the Sandiganbayan Court, "[t]he withdrawal turned out to be a ploy for a scheme to proceed with the sale without the obstruction of unexpected negative [Sandiganbayan Court] Order." *Id.* at 7. With regard to Daguna's apparent inside information, the Sandiganbayan Court stated that it "views with concern the alacrity with which the prospective buyer of that aircraft sought a copy of this Court's resolution almost simultaneously with the announcement of the cynical maneuver by which the PCGG intended to do away with Court authority for the disposition of property in *custodia legis*—which is what sequestered property is." *Id.* at 9.

Obviously appalled by the PCGG's scheme, the Sandiganbayan Court recalled its resolution permitting the PCGG to withdraw its Motion to Sell. *Id.* Once this resolution was recalled, the Sandiganbayan Court ruled on the merits of PCGG's Motion for Authority to Sell the Falcon and denied it in scathing language:

> For this Court to allow the sale of the property belonging to a stranger to the suit (the lessor) to take place more than two years *after* the lease thereof had expired (and when return, therefore, should have been made to the owner/lessor), and for that sale to be justified only by the fact that this very valuable piece of property (U.S. $10 million) has rapidly deteriorated for having been unattended to by the very sequester itself, as the sequester PCGG has said, is neither just nor legal.
>
> What is worse is that plaintiff has acted before this Court without any care or effort to show that these facts and events notwithstanding, the sequestration was at least apparently appropriate. The PCGG, in the words of the Supreme Court, is not above the law ... and it is bound to justify its continued exercise of powers in the face of its own contradicting evidence.
>
> . . . .

For all of these reasons, plaintiff cannot ask this Court to sanctify its acts as sequester while, in the face of its own debilitating evidence, it remains unwilling to explain why a stranger's property has been sequestered.

*Id.* at 10, 12 (citation omitted).

Finally, the Court criticized the basis asserted by the PCGG as an excuse to sell the Falcon:

> Plaintiff urges authority to sell because the airplane is allegedly deteriorating rapidly, the airplane by the plaintiff's own admission having been unattended to since sequestration. Care of sequestered property is the sequesterer's primary responsibility. Plaintiff's failure at that duty cannot justify the sale of *property which, to all appearance, belongs to a stranger and should not have been seized in the first place.*

*Id.* at 13 (emphasis supplied).

The Motion to Sell was denied "since in the very first instance, no justification *prima facie* or otherwise has been demonstrated for its seizure from its lessee." *Id.*

When the Sandiganbayan Court issued this scathing opinion on May 18, 1989, the PCGG sought immediately to avoid this public rebuke and also to avoid the Sandiganbayan Court's injunction "to report to the court the status of the projected sale of the aircraft and its present location" within ten days of the Order. (Condes Dep., Response Ex. T at 6, 12–13). An Assistant Solicitor General for the Philippines agreed on behalf of the Solicitor General to help the PCGG avoid the Sandiganbayan Court's Order in return for a "token" from the proceeds of the sale. (Condes Dep., Response Ex. T at 6, 12–13).

Thereafter, on June 6, the PCGG filed a petition for certiorari with the Supreme Court of the Philippines requesting (a) a temporary restraining order from enforcement of the Resolution of the Sandiganbayan Court, and (b) ultimately a ruling that the Resolution is void as undue interference with the administrative/executive functions of the PCGG (Response Ex. X–1). The PCGG did not seek a ruling that the sequestration was valid or a ruling as to

the lawful owner of the Falcon, asserting instead that the sale of the Falcon will not "prejudice the rightful owners as may be finally declared by the respondent Sandiganbayan." *Id.* at 26. On the same day the Petition was filed, the Supreme Court "Resolved, *without giving due course to the petition,* to require the respondent to COMMENT" on the petition and in the interim issued a temporary restraining order ordering the Sandiganbayan Court to desist from enforcing the Resolution pending further order of the Court. (Response Ex. Y (emphasis supplied)). That is, the Supreme Court did not even consider whether it would grant certiorari and hear an appeal; the effect of its ruling is that only the reporting requirement of the Resolution was temporarily stayed. (Antonio Aff., Response Ex. U at 18–19).

Commissioner DeLeon, whose activities in connection with the sale of the aircraft are highly suspicious, seized upon the action of the Supreme Court, which were actually not significant, as granting authority for the PCGG to sell the plane. The Supreme Court has never granted such authority nor has it granted any review of the decision of the Sandiganbayan Court. On September 21, 1989, the PCGG accepted Fuller's bid subject to settling with Condes to satisfy the "Condes lien." Condes was a major factor in the negotiations between the putative purchaser and the PCGG. This lien in the amount of 1.7 million dollars appears to be a cover for bribes paid to various Philippine officials. Slightly over five million dollars went to the PCGG.

The PCGG gave a bill of sale to Fuller. The plane was flown out to be reconditioned at Falcon Jet's maintenance plant at Little Rock, Arkansas, where it is now located.

## II. DISCUSSION

### A. The Treaty Exception of the "Act of State" Doctrine

Both parties have moved for summary judgment. Summary judgment is granted in favor of the plaintiff Faysound and denied as to defendant Walter Fuller Aircraft Sales, Inc. Defendant seeks to defend a clear expropriation of plaintiff's property on the ground of the "act of state" doctrine. This doctrine was articulated in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), where the Castro government in Cuba expropriated a shipment of sugar sold under a futures contract while the sugar was being loaded on a ship in Cuba. The Supreme Court held:

> [T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

376 U.S. at 427–28, 84 S.Ct. at 940.

This case comes clearly within the exception noted, *supra.* Both the United States and the Philippines are signatories to the Geneva Convention, which covers property rights in aircraft along with other aviation subjects. While the *Sabbatino* Court was not anxious to enter the conflict of ideologies involved in the Cuba expropriation, it acknowledged that most principles of international law are not so difficult:

> There are, of course, areas of international law in which consensus as to standards is greater and which do not represent a battleground for conflicting ideologies. This decision in no way intimates that the courts of this country are broadly foreclosed from considering questions of international law.

376 U.S. at 430, n. 34, 84 S.Ct. at 941, n. 34. The Geneva Convention represents an area of broad international consensus. The Treaty in Article I provides as follows:

> (1) The Contracting States undertake to recognize:
>
> (a) rights of property in aircraft;
>
> (b) rights to acquire aircraft by purchase coupled with possession of the aircraft;
>
> (c) rights to possession of aircraft under leases of six months or more;
>
> (d) mortgages, hypotheques and similar rights in aircraft which are contractu-

ally created as security for payment of an indebtedness;

provided that such rights

(i) have been constituted in accordance with the law of the Contracting State in which the aircraft was registered as to nationality at the time of their constitution, and

(ii) are regularly recorded in a public record of the Contracting State in which the aircraft is registered as to nationality.

(2) Nothing in this Convention shall prevent the recognition of any rights in aircraft under the law of any Contracting State; but Contracting States shall not admit or recognize any right as taking priority over the rights mentioned in paragraph (1) of the Article.

The case at bar is clearly within the exception noted in *Sabbatino*. The expropriation in that case was not proscribed by a treaty couched in clear and unambiguous terms. Congress almost immediately enacted legislation to overrule the decision. The Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2) was "enacted to make sure that the United States not become a 'thieves market' for the product of foreign expropriation." 110 Cong.Rec. 19,557, 88th Cong. 2d Sess. (1964):

The amendment is designed to discourage uncompensated expropriation of foreign investment by preserving the right of the original owners to attack any taking in violation of international law if the property involved comes before a U.S. court. Because the United States is the largest market for the products of many U.S. owned companies in foreign countries, the knowledge that this market will be denied to stolen property should discourage seizure of that investment.

*Id.*

On remand of the *Sabbatino* case from the Supreme Court of the United States, the District Court and the Court of Appeals for the Second Circuit held that the Hickenlooper Amendment compelled a different result and had in effect vitiated the *Sabbatino* decision. *Banco Nacional de Cuba v. Farr*, 243 F.Supp. 957 and 272 F.Supp. 836 (S.D.N.Y.1965), *aff'd.* 383 F.2d 166 (2d Cir.

1967), *cert. denied* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968). Any remaining efficacy of the *Sabbatino* case has been further weakened by the decisions of the Supreme Court in *First Nacional City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); and *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, —— U.S. ——, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

Fuller argues that the Hickenlooper Amendment applies only if the property of a United States citizen is involved and only when the expropriated property or its proceeds were in the United States when the expropriation occurred. For its claim that the Amendment does not apply to aliens, Fuller Aircraft cites the First Hickenlooper Amendment, 22 U.S.C. § 2370(e)(1), rather than the Second Hickenlooper Amendment. Unlike the Second Hickenlooper Amendment, the First Hickenlooper Amendment by its terms refers only to United States citizens. The Second Hickenlooper Amendment contains no such limitation. Indeed, the Reporters for the Restatement of the Foreign Relations Law of the United States disagree with Fuller Aircraft's contention. "The Amendment, if otherwise applicable, would apparently apply to a claim by an alien as well as by a national of the United States...." *Rest. 3rd, Restatement of the Foreign Relations Law of the United States*, § 444, Reporter's Note 6.

Fuller Aircraft is similarly misguided in arguing that the Second Hickenlooper Amendment does not apply because the Falcon was not in the United States when the expropriation occurred. Comment e to § 444 of the *Rest. 3rd, Restatement of the Foreign Relations Law of the United States* provides:

e. *Claim to specific property.* The exception to the Act of State Doctrine embodied in the Second Hickenlooper Amendment has been held to be limited to actions asserting title to property *before the court.* Thus, if the plaintiff claims ownership of a vessel that has been taken by a foreign state and the

vessel is at a port in the United States, the plaintiff may rely on the Amendment in asserting title before a court in the United States....

In order for the Hickenlooper Amendment to apply, the plaintiff must allege and prove that the property that is the subject of the claim is in the United States or was there at the time the action was commenced.

(Emphasis supplied).

As noted above, the *Sabbatino* case makes a clear exception where the expropriation is covered by a treaty. The act of state doctrine "was never intended to apply when an applicable bilateral treaty governs the legal merits of the controversy." *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1540 (D.C.Cir.1984). The provisions of the Treaty set out, *supra*, are clear and unambiguous. They provide governing legal standards for the Court's determination of the issues:

Additionally, there is a great national interest to be served in this case, i.e., the recognition and execution of treaties that we enter into with foreign nations. Article VI of the Constitution provides that treaties made under the authority of the United States shall be the supreme law of the land. Accordingly, the Supreme Court has recognized that treaties, in certain circumstances, have the "force and effect of a legislative enactment." *See, e.g., Whitney v. Robertson*, 124 U.S. 190 [8 S.Ct. 456, 31 L.Ed. 386] (1888). The failure of this Court to recognize a properly executed treaty would indeed be an egregious error because of the position that treaties occupy in our body of laws.

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 729 F.2d 422, 428 (6th Cir.1984).

B. Applicability of "Act of State Doctrine"

■ Another serious question in this case is whether the acts of the PCGG were true "acts of state." Fuller must prove that PCGG exercised sovereign power in its sequestration and sale of the Falcon. We hold it did not exercise such power. *Alfred*

*Dunhill of London v. Republic of Cuba*, 425 U.S. at 691, 96 S.Ct. at 1859.

The only evidence offered to show that PCGG had authority to sell the plane in the exercise of Philippine sovereignty is an affidavit from Rosalio DeLeon, a PCGG Commissioner. DeLeon's motives and actions are highly suspect. He is the brother-in-law of Ben Cuevo, one of the Philippine "middle men" appointed as exclusive agent by Fuller.

Plaintiff has submitted the deposition testimony of Art Condes, one of the main players in the attempt to sell the Falcon, that DeLeon was to receive a bribe of $150,000. Plaintiff has also submitted an affidavit from a former Solicitor General and Supreme Court Justice, specifically controverting DeLeon's affidavit with regard to the PCGG's authority under a Writ of Sequestration:

Assuming, however, that the Falcon aircraft had been validly sequestered ... there can be hardly any doubt that the sequestration of the aircraft may be deemed to have been "automatically lifted" as of August 2, 1987.

. . . .

But even if it is assumed that the sequestration of June 19, 1986, on the Falcon aircraft continues to be effective, PCGG had no authority to sell the aircraft. The power to sell property pertains to the owner (Article 428 and 429, Civil Code). And the Supreme Court has ruled that sequestration does not vest in the PCGG the right of ownership.

(Antonio Affidavit, Response Ex. U at 11,-12).

Assuming that the above conduct raises factual issues that are not appropriate for disposition by summary judgment, there are other factors that as a matter of law preclude Fuller reliance on the "act of state" doctrine. To establish that sale of the plane was an act of state, Fuller relies on three executive orders of President Aquino which are summarized as follows. Executive Order No. 1 creates the PCGG for the purpose of recovering all ill-gottten wealth. It charges the PCGG with the task of assisting Aquino in (1) recovering

all ill-gotten wealth accumulated by Marcos and his close associates; (2) investigating cases of graft and corruption assigned to it by the President; (3) sequestering or placing or causing to be placed under its control or possession any building or office wherein any ill-gotten wealth or properties may be found; (4) provisionally taking over in the public interest or to prevent its disposal or dissipation, business enterprises and properties of Marcos and his close associates.

Executive Order No. 2 addresses the funds, money, assets and properties illegally acquired or misappropriated by Marcos and his associates. This order (1) authorizes the freezing of all assets and properties in the Philippines in which Marcos or his associates have an interest or participation; (2) prohibits any person from transferring, conveying or otherwise depleting or concealing such assets; (3) requires all persons in the Philippines holding such assets to make such disclosure; and (4) authorizes the PCGG to request and appeal to foreign governments wherein any such assets or properties may be found to freeze them pending adjudication of ownership in the Philippine Court.

Executive Order No. 14 gives the Sandiganbayan Court original jurisdiction over cases involving the ill-gotten wealth of Marcos and his associates. No provision of these executive orders authorizes the expropriation and sale of property belonging without question to a Hong Kong national.

The writ of sequestration that PCGG issued against Eduardo Cojuangco, Jr. surely cannot be the "act of state" on which Fuller relies. Cojuangco did not own the plane. A company in which he owned stock leased the plane. The lease had almost expired. The owner of the plane is not a party to the sequestration order. In any event sequestration by the PCGG vests no title in the latter, as the Philippine Supreme Court has aptly pointed out. It is a method of conserving the property *pendente lite*.

> [T]he act of sequestration, freezing or provisional takeover of property does not import or bring about a divestment of title over said property; does not make the PCGG the owner thereof. In relation to the property sequestered, frozen or

provisionally taken over, the PCGG is a conservator, not an owner. Therefore, it cannot perform strict acts of ownership. *Baseco v. PCGG*, 150 S.Ct.Rep.Ann. 81, 236 (Philippine S.Ct.1987).

As a matter of fact, Fuller in his original brief identified the PCGG as a receiver. A court-supervised trustee does not exercise sovereign power under the "act of state" doctrine. *See Remington Rand Corp. v. Business Systems, Inc.*, 830 F.2d 1260 (3rd Cir.1987). The PCGG as a receiver must act under the authority of a court. By President Aquino's Executive Order No. 14, that court was the Sandiganbayan Court. That Court denied PCGG the authority to sell this plane and scathingly denounced its action in regard to the seizure and attempted sale of the plane, as was pointed out, *supra*, in the Statement of Facts. The order was never reversed or vacated by the Supreme Court.

■ To qualify as an act of state, it is necessary to prove that the act "occurred as a result of a considered policy determination by a government to give effect to its political and public interest—matters that would have significant impact on American foreign relations." *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1295 (3rd Cir.1979). The Court in *Mannington Mills* refused to grant "act of state" status to a foreign sovereign's grant of a patent. Similarly, a foreign judicial judgment in a case involving private litigants does not rise to the status of an act of state. *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 607–08 (9th Cir. 1976). Nor does a party's initiation of foreign judicial proceedings amount to an act of state. *Dominicus Americana Bohio v. Gulf & Western*, 473 F.Supp. 680, 689 (S.D. N.Y.1979). And as the Supreme Court stressed in *Alfred Dunhill of London, supra*, a foreign naval officer's operation of the foreign sovereign's ship on behalf of the sovereign does not give rise to an act of state. 425 U.S. at 693–64, 96 S.Ct. at 1860–61.

## C. The Bribery Issue

This court is reluctant to rely on the rather obvious inference that the transac-

**1374**

tion was tainted with bribery and corruption. One significant aspect is that Fuller was required to discharge the so-called "Condes lien" before the sale could be completed. The amount of this lien was never disclosed but appears to have been in the neighborhood of two million dollars. It is a fair inference that the Condes lien was a device to cover up and launder bribes to various Philippine officials. Such factual proof is difficult when the site of the transaction is in a foreign country. I do not find it necessary to decide the bribery issue as a further means of negating the "act of state" doctrine on which Fuller relies. *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.,* — U.S. —, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). There is ample basis for sustaining the plaintiff's motion for summary judgment on other grounds.

## III. CONCLUSION

The PCGG expropriated an expensive airplane without any legal basis whatsoever. Although the plane was leased to a company in which an associate of Ferdinand Marcos was a stockholder, the Marcos associate owned no interest whatsoever in the plane, and the lease was near the end of its term. The plane was nevertheless seized and sold in a transaction having the strong odor of corruption. The sale was made in the face of an adverse ruling by the Philippine court having supervision over it—a ruling never reversed by the Philippine Supreme Court. The seizure and sale violated the specific terms of the Treaty known as the Geneva Convention covering property rights in aircraft. It violated principles of international law, the Second Hickenlooper Amendment, as well as principles of Philippine law enunciated by the Philippine court having jurisdiction over this matter.